Kevin Fisher (State Bar No. 131455)
Praxis Law
P.O. Box 26249
Los Angeles, CA 90026
Telephone: (310) 862-1225
Facsimile: (310) 388-0805
rkf@fkslaw.net

Julian Brew (State Bar No. 150615)
Cypress, LLP
11111 Santa Monica Boulevard, Suite 500
Los Angeles, CA 90025
Telephone: (424) 317-6220
Facsimile: (424) 750-5100
julian@cypressllp.com

Attorneys for Plaintiff
SWEETWATER MALIBU CA, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SWEETWATER MALIBU CA, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>MAURICIO UMANSKY; UMRO REALTY CORP., a California corporation, dba THE AGENCY,<br><br>Defendants. | CASE NO.:<br><br>COMPLAINT FOR:<br>**(**1) BREACH OF SETTLEMENT AGREEMENT & ORDER;<br>(2) BREACH OF FIDUCIARY DUTIES;<br>(3) STATUTORY VIOLATIONS;<br>(4) BREACH OF LISTING AGREEMENT;<br>(5) INTENTIONAL FRAUD;<br>(6) NEGLIGENT MISREPRESENTATION;&<br>(7) NEGLIGENCE & NEGLIGENCE PER SE<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiff Sweetwater Malibu CA, LLC, formerly known as Sweetwater Malibu, LLC ("Sweetwater"), for its Complaint against defendants Mauricio Umansky ("Umansky") and UMRO Realty Corp. doing business as The Agency (the "Agency") (collectively, "Defendants"), alleges as follows.

**JURISDICTION**

1. This action relates to and includes claims against Defendants for breach of a Stipulation and Settlement Agreement (the "Settlement Agreement") entered into in connection with a civil asset forfeiture action in the United States District Court for the Central District of California, entitled <u>United States of America v. One Michael Jackson Signed Thriller Jacket, et al</u>. (Case No. CV 13-9169-GW-SS) (the "Action").  The Settlement Agreement expressly bound and imposed obligations on Defendants.  Defendants also expressly agreed to comply with the Settlement Agreement and be bound by its terms.

2. The Settlement Agreement provides that the "the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Settlement Agreement is the United States District Court for the Central District of California," and that such court "shall retain jurisdiction to enforce this Settlement Agreement."

3. The Settlement Agreement was filed in the Action, and the Court entered an Order on October 13, 2014 (the "Order"), ordering each party to "cooperate with the other(s) to perform the acts required by the Settlement Agreement, and [to] refrain from taking any action that is inconsistent with the Settlement Agreement."  The Order stayed the Action and stated that the "Court retains jurisdiction in this matter to take additional action and enter further orders as necessary to implement and enforce this Order and the Settlement Agreement."

4. Accordingly, this Court has ancillary jurisdiction and/or supplemental jurisdiction over the claims in this action, because they include claims for breaches of the Settlement Agreement which also constituted violations of the Order issued by the United States District Court for the Central District of California.  *see* <u>Kokkonen v. Guardian Life Ins. Co.</u>, 114 S. Ct. 1673 (1994).

**INTRODUCTION**

5.     This case involves brazen breaches of fiduciary duties by a high-end real estate broker and his firm the Agency, who were hired to sell a multi-million-dollar Malibu estate owned by Sweetwater.  As Sweetwater's brokers, Defendants owed Sweetwater statutory, contractual and common law duties, including the highest fiduciary duties of care, loyalty and honesty.  The duties owed by Defendants included the duty to disclose all facts relevant to Sweetwater's decisions in connection with the sale of the property, the duty to disclose all offers for the property, and the duty not to engage in self-dealing or earn secret profits from the representation.

6.     While every real estate broker owes these duties to its clients, Defendants held themselves out as a premier brokerage firm, with unique skills and connections that would enable them to be trusted to obtain the best possible prices for their clients in the sale of ultra-high priced and extremely valuable properties, and charged clients a premium commission for their services.  Defendants relied on this purported expertise in retaining Defendants at a commission above the normal market rate for real estate brokers in California.

7.     Defendants violated virtually every one of these duties, by engaging in blatant acts of self-dealing, earning secret profits, and both failing to disclose and outright misrepresenting material facts.  Among other things, they advised Sweetwater to accept an offer from another client and partner Mauricio Oberfeld, without disclosing that (i) they knew that a far higher price could have been obtained, (ii) Oberfeld would need to obtain financing or investors in order to close the purchase, despite purporting to offer an "all cash" deal without the need for financing, (iii) Defendants were secretly working for Oberfeld to find him buyers and investors to complete the purchase, and (iv) Defendants had been offered secret compensation from buyers they recommended, and favored offers from their other existing clients.

8.     After persuading Sweetwater to accept Oberfeld's offer, Defendants failed to disclose additional material facts, including their receipt of offers millions of dollars higher than Oberfeld's that they instead delivered to Oberfeld and that provided Defendants with additional secret profits, Oberfeld's offer to allow Defendants to partner with him in a purchase and "flip" of the property, and that Defendants were actively searching for buyers of the property from Oberfeld

for millions of dollars more. Without disclosing these facts, Defendants pressured Sweetwater to waive a required $1 million deposit from Oberfeld, thereby allowing him to tie up this valuable property for no consideration. Defendants also pressured Sweetwater to repeatedly extend the escrow as they looked for investors and buyers for Oberfeld, and to agree to a repair credit of $1 million, while insisting that the market was softening and no other buyer could be found.

9. As a result of Defendants' flagrant breaches of their fiduciary, statutory and contractual duties, Oberfeld was able to purchase the property for less than $32 million, well below its potential price, and to sell it less than a year later for almost $70 million, resulting in massive profits that Oberfeld shared with Defendants.

## THE PARTIES

10. Plaintiff Sweetwater Malibu CA, LLC, formerly known as Sweetwater Malibu, LLC, is and at all relevant times was a California limited liability company and the owner of a multi-million-dollar estate located at 3620 Sweetwater Mesa Road in Malibu, California (the "Property"). Pursuant to an agreement between Sweetwater's principal Teodoro Nguema Obiang Mangue, now Vice President of Equatorial Guinea ("EG"), and the United States Department of Justice, Sweetwater agreed to sell the Property, and use the proceeds to benefit the people of EG.

11. Mauricio Umansky is and at all times was a resident of the State of California, Los Angeles County. He is and at all relevant times a real estate broker licensed by the California Department of Real Estate.

12. Defendant UMRO Realty Corp., is a California corporation, with its principal place of business in Los Angeles County, California, which does business as The Agency. Umansky is and at all relevant times was its founder and CEO.

13. On information and belief, each defendant was the agent, employee, principal, or co-conspirator of each other Defendant, or aided and abetted their wrongdoing, acting within the course and scope of such agency or employment, or in furtherance of such conspiracy, such that each is jointly and severally liable for the damages alleged herein.

**FACTS COMMON TO ALL CAUSES OF ACTION**

14. On December 12, 2013, the United States filed the Action, seeking among other things civil forfeiture of the Property. On or about October 9, 2014, the parties entered into the Settlement Agreement, resolving those claims by, among other things, providing for Sweetwater to sell the Property using a licensed real estate broker, with the proceeds of the sale to be used for the benefit of the people of EG. The Settlement Agreement was filed in the Action, and the Court entered an Order on October 13, 2014 (the "Order"), ordering each party to "cooperate with the other(s) to perform the acts required by the Settlement Agreement, and [to] refrain from taking any action that is inconsistent with the Settlement Agreement."

15. The Settlement Agreement provides that the parties shall jointly select a licensed real estate agent to list and sell the Property, and that the contract with the agent "will require that the Licensed Agent review and comply with the provisions of this Settlement Agreement."

16. The Settlement Agreement provided that the listing agent was obligated "to work cooperatively with the United States in the conduct of its activities, including reporting regularly to the United States and providing all requested information promptly to the United States relating to the [property] and its sale." The Settlement Agreement provides that the property "will be sold in accordance with the terms of this Settlement Agreement for fair-market-value ("FMV"), as that term is defined pursuant to California Code of Civil Procedure Section 1263.320, unless a sale at an alternative price is approved in writing by both counsel for the United States and counsel for Nguema, in arm's length transactions. . ."

17. Section 1263.320 defines fair market value as: "The fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available.

18. Defendants are very high-end licensed real estate brokers, who hold themselves out as the "preeminent player in the luxury real estate market, representing many of the country's most

visible and high-end properties." Defendants tout to their prospective clients their "knowledge, spheres of influence, contacts and expertise, ensuring our clients better representation and a true competitive edge." Umansky personally promotes himself "as the #3 top-producing real estate agent in the U.S. and #1 in California," having sold the most homes in the country above $20 million, and his representation of celebrities and very wealthy individuals. He also is married to one of the "Beverly Hills Housewives," and has frequent appearances on the show, adding to his carefully cultivated persona and reputation.

19. In 2015, pursuant to the Settlement Agreement and Order, Defendants entered into an exclusive listing agreement (the "Listing Agreement") with Sweetwater, which provided for a commission of 6% of the sale price, higher than the typical amount of 5% or less. Sweetwater agreed based on Umansky's reputation, and the belief he could be trusted to get the best possible price. The Listing Agreement obligated Defendants to comply with the Settlement Agreement, and provided that the "Settlement Agreement provisions will prevail in the event any of them conflict with the terms in this Agreement." While Defendants had to agree that any sale would comply with the Settlement Agreement, their only client was Sweetwater, which owned the property and had the sole discretion to agree to any sale over $32 million.

20. After entering into the Listing Agreement, Umansky presented offers from several potential buyers, most of whom were also his clients, thereby entitling him to the full commission of 6%. All of the offers were supposedly in the range of $32 to $33.5 million.

21. At Umansky's recommendation, Sweetwater countered to all at $33.5 million instead of higher. Of those who accepted, Umansky pressed Sweetwater to proceed with one of his clients, Oberfeld, instead of a non-client who also made a $33.5 million offer and likely would have paid more. Sweetwater followed this advice and accepted Umansky's offer.

22. Sweetwater has since learned that, despite making an "as is" cash offer, Oberfeld in fact did not have the funds to close the purchase, and was seeking both a loan and investors to help pay the purchase price, or to find another buyer to whom to flip the property. Umansky was well aware of this information before presenting the offer that specifically stated there would be no

third-party financing, but did not disclose it to Sweetwater. Indeed, Defendants were already actively helping Oberfeld find buyers and investors.

23. Umansky also failed to disclose to Sweetwater that the agent for Sam Hakim, whose offer was accepted as a backup at his recommendation, had agreed in writing to kick back to Umansky one third of his share of the commission as secret profits. Neither the offer nor signed addendum to the offer confirming the kickback were disclosed to Sweewater. Umansky wrote in response: "Received. You are a man of your word. I truly hope that you get picked."

24. Even more troubling, Umansky was helping Oberfeld find investors and buyers, and received offers to pay millions more for the Property than Oberfeld. Umansky did not deliver these offers to his client and Property owner Sweetwater, but presented them to Oberfeld, who did not yet own the Property, and had not paid the required deposit or satisfied contingencies.

25. On December 23, Umansky wrote Oberfeld to tell him his offer had been picked. Oberfeld responded: "Fantastic. Moe, how did it go w your guy." Umansky quickly responded: "Very well. He might take it off our hands. I pitched it for 42." In other words, by the time Umansky persuaded Sweetwater to accept Oberfeld's offer at $33.5 million, he was already secretly discussing sale of to a third party for almost $10 million more.

26. In February 2016, Umansky received an offer from another buyer for $8 million over the offer from Oberfeld, with 4% million payable to Umansky as a commission. Umansky presented the offer to Oberfeld, but not Sweetwater, which owned the property. Also undisclosed to Sweetwater, Umansky sent Hakim a counter-offer of $15 million on behalf of Oberfeld, with the same 4% commission to Defendants on the resale or "flip."

27. Not only did Defendants fail to disclose these other higher offers or that Oberfeld needed to find investors to close, but they also urged Sweetwater to waive the required $1 million deposit, claiming "the Buyer is concerned about having 1 Million dollars tied up indefinitely" and it would not be possible to find another buyer for the property when they knew that it was because Oberfeld had not yet raised enough money. Sweetwater agreed in reliance on this advice. Thus, with Umansky's help, Oberfeld tied up a $33.5 million property without a penny at risk, while the seller's broker helped him looked for a buyer of his own.

28. With the deadlines for various contingencies and close rapidly approaching, Umansky repeatedly urged Sweetwater to extend the contingency period and close of escrow, in contrast to his advice to accept Oberfeld's offer because of the supposed urgency in closing before March. While he and Oberfeld secretly worked to flip the property, Umansky persuaded Sweetwater to agree to several extensions without disclosing these efforts.

29. In April, Umansky was still helping Oberfeld find investors or buyers so he could complete the purchase. Despite having agreed to buy the property "as is," Oberfeld requested a $1 million credit for repairs. Instead of telling Sweetwater it could deny the request and that other buyers had offered to buy the property for more money, Umansky pushed Sweetwater "so hard" to agree to the credit. Ultimately, Sweetwater reluctantly agreed, benefiting the buyer and anyone else who would receive an interest in the flip, including Umansky. The United States has taken the position that Sweetwater is itself liable for this $1 million.

30. Just two weeks before the close, with contingencies cleared and the deed signed by Sweetwater, Umansky wrote the Department of Justice that Oberfeld had just "invited me to invest with him" and "to express my intention of making an investment with Mauricio Oberfeld into the deal." Three days later, Umansky wrote an e-mail to Sweetwater about several topics. Towards the end of the e-mail Umansky wrote, "for the sake of full disclosure . . . Mauricio [Oberfeld] invited me to invest about one month ago after we removed all contingencies [and] I do intend to make an investment with them." This "full disclosure" was anything but. This "disclosure" was not made until it was too late for Sweetwater to get out of the sale to Oberfeld. It also itself was another fraud, as conspicuously absent was any disclosure of Umansky's other dealings, financial interests, and conflicts outlined above.

31. In mid-2017, less than a year after the close of the sale to Oberfeld and his "partners," including Umansky, they resold the property for $69.9 million, more than double what they paid. An earlier article stated that: "Oberfeld bought the neglected property, on Sweetwater Mesa Road, in partnership with Mauricio Umansky, co-founder of luxe brokerage the Agency, last year, records show." It cited sources stating "the partners are likely to make a hefty profit, since

they acquired the property for a massive discount." The Agency website also referred to Oberfeld as one of its "partners," and featured him posing with Umansky.

32. After learning this information, Sweetwater's counsel wrote Umansky and The Agency to demand additional information about his involvement in the transactions. On April 6, 2018, Defendants entered into a written tolling agreement that, as amended, extending any statute of limitations of other defense based on the passage of time for an additional nine months.

## FIRST CAUSE OF ACTION

### (Breach of Settlement Agreement and Order)

33. Plaintiff hereby incorporates in this cause of action paragraphs 1 through 32 inclusive above as though fully set forth herein.

34. As set forth above, the Settlement Agreement and Order imposed obligations on Defendants as listing agents for the Property, including the obligations to sell the Property for fair market value, and to work cooperatively with the United States and provide it with relevant information related to the Property and sale. The Settlement Agreement also included an implied covenant of good faith and fair dealing in Defendants' performance. In the Listing Agreement, Defendants specifically agreed to comply with the Settlement Agreement and agreed that its terms would prevail in the event of a conflict between the two agreements.

35. Defendants knew at the time of the sale of the Property to Oberfeld that it was not being sold for fair market value and could be sold for millions of dollars more than the sale price. By knowingly advising Sweetwater to agree to and close the sale to Oberfeld for far less than its fair market value, knowing that higher offers had been made or could be achieved, Defendants breached the Settlement Agreement and violated the Order.

36. Defendants also breached the Settlement Agreement and violated the Order by failing to work cooperatively with the United States and provide truthful and accurate information, by providing materially false information related to the Property and sale, and by knowingly misleading the United States and Sweetwater as to offers and other facts material to decisions with respect to the sale. If Defendants had provided accurate information as alleged herein, the United

States would have advised Sweetwater and both Sweetwater and the United States would had accurate information to make decisions concerning the Property.

37. As legal and proximate result of these breaches, Sweetwater was damaged in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duties)

38. Plaintiff hereby incorporates in this cause of action paragraphs 1 through 37 inclusive above as though fully set forth herein.

39. As real estate brokers, Defendants owed Sweetwater fiduciary duties, including duties of the utmost care, integrity, honesty, and loyalty, and the duties to notify the client of all offers and to give the client all information in the broker's possession that may be material to the client's decisions in connection with the sale.

40. While California allows a broker to represent both the buyer and seller in the same transaction, with full disclosure of the arrangement and informed consent, it continues to owe fiduciary duties to both clients, limited only by the proviso that it may not disclose to either client that the other is willing to pay (or accept) a higher (or lower) price for the property. Among other things, a dual agent must still disclose to the seller the duty to disclose all material facts other than any higher price the buyer is willing to pay, and a fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the seller or the buyer.

41. Among the duties owed by real estate brokers is a duty not to receive any secret profits arising from the representation without full disclosure of details of the arrangement and informed consent of the client. This duty is codified by statute, and violation of this duty also is grounds for disciplinary action including loss of the broker's license. Cal. Bus. & Prof. Code § 10176(g). A broker or agent who receives secret profits also must disgorge them to his client, whether or not the client would have received a better price absent them.

42. Defendants' duties to Sweetwater did not end with the signing of a purchase agreement, but continued until at least the close, especially because Defendants successfully pressured Sweetwater to (ii) waive the requirement that Oberfeld pay a deposit of $1 million, (ii)

1 | extend deadlines for physical inspection contingencies and close of escrow instead of exercising
2 | its right to terminate the sale to Oberfeld due to his breaches and failure to satisfy conditions, and
3 | (iii) agree to a $1 million credit for repairs.

4 |   43. If Defendants had not breached their fiduciary duties, Sweetwater would not have entered into the purchase agreement with Oberfeld or would have terminated the purchase due to Oberfeld's failure to pay the required deposit, failure to close by the required date, or failure to waive the physical inspection contingency, and would have sold the property to another buyer for millions of dollars more.  Alternatively, if Oberfeld had timely cured those breaches, Sweetwater would not have agreed to the demand for a $1.3 million repaid credit.

  44. As a proximate and legal result of Defendants' breaches, Sweetwater has been damaged in an amount to be proven at trial.

  45. Defendants acted with fraud malice and oppression, entitling Sweetwater to recover punitive or exemplary damage in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### (Violations of Statutes Governing Licensed Brokers)

  46. Plaintiff hereby incorporates in this cause of action paragraphs 1 through 45 inclusive above as though fully set forth herein.

  47. California Business & Professions Code section 10176 prohibits and provides for disciplinary proceedings against any licensed real estate broker who engages in any of several specified violations, including making of any "substantial misrepresentation" and "claiming or taking by a licensee of any secret or undisclosed amount of compensation, commission, or profit or the failure of a licensee to reveal to the employer of the licensee the full amount of the licensee's compensation, commission, or profit[.]"

  48. California Civil Code section 2079.16 provides that, in order to represent both buyer and seller in a real estate transaction, a licensed broker must fully disclose all arrangements to both parties and obtain their informed consent, and owes a fiduciary duty of the utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer, including a duty to disclose to the seller material facts affecting the transaction.

49. As set forth above, Defendants made numerous substantial misrepresentations to Sweetwater in the course of the sale of the Property, failed to disclose agreements with Oberfeld and others providing for secret profits and commissions in addition to commissions paid by Sweetwater under the listing agreement, as well as other material facts, and breached duties of care, integrity, honesty and loyalty to Sweetwater.

50. If Defendants had disclosed these offers and facts, Sweetwater would not have entered into the purchase agreement with Oberfeld or would have terminated the purchase due to his failure to pay the agreed deposit, failure to close by the agreed date, or failure to timely satisfy the inspection contingency, and would have sold the Property to another buyer for millions of dollars more than Oberfeld.  Alternatively, if Oberfeld timely cured those breaches, Sweetwater would not have agreed to the demand for a $1 million repaid credit.

51. As a proximate and legal result of Defendants' breaches, Sweetwater has been damaged in an amount to be proven at trial and is also entitled to recover all profits received by Defendants related to the property, and profits received by Oberfeld and other investors, that were not disclosed to Sweetwater or for which Sweetwater did not give informed consent.

### FOURTH CAUSE OF ACTION

**(Breach of Listing Agreement)**

52. Plaintiff hereby incorporates in this cause of action paragraphs 1 through 51 inclusive above as though fully set forth herein.

53. The Listing Agreement between Defendants and Sweetwater imposed on Defendants, among other things, (i) a duty to present to Sweetwater any and all offers for the property, (ii) a duty to use reasonable care and due diligence in carrying out the agreement, (iii) a duty to disclose all facts affecting the value or desirability of the property, (iv) fiduciary duties of the utmost care, honesty, integrity and loyalty, and (v) a duty to disclose any and all financial and other arrangements with the buyer in the case of a dual agency.

54. As alleged in greater detail above, Defendants breached the Listing Agreement by, among other things, their (i) failure to disclose to Sweetwater multiple offers for the Property that exceeded the price offered by Oberfeld, (ii) failure to exercise reasonable care and due diligence,

(iii) failure to disclose numerous material facts affecting the value and desirability of the Property. (iii) failure to act with the utmost care, loyalty, integrity and honesty, and (iv) failure to disclose all facts concerning their financial and other arrangements with the buyers.

55.  As a proximate and legal result of Defendants' breaches, Sweetwater has been damaged in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### (Intentional Fraud)

56.  Plaintiff hereby incorporates in this cause of action paragraphs 1 through 55 inclusive above as though fully set forth herein.

57.  As alleged in greater detail above, Defendants knowingly misrepresented to Sweewater material facts, including (i) that the offer from Oberfeld was "all cash" not contingent on any third party financing, (ii) that Defendants were using their best efforts and due diligence to sell the property for Sweewater, (iii) that Oberfeld was ready, willing and able to close the sale within 60 days, (iv) that Sweetwater would be unable to find another buyer at the same or greater price if it did not waive the agreed deposit, extend escrow, and agree to a $1 million credit for repairs, (v) that Defendants were first offered the opportunity to "invest" in the Property only after all contingencies were satisfied, and (vi) that Oberfeld's offer was the highest.

58.  As alleged in greater detail above, Defendants also failed to disclose material facts they had duty to disclose, including the (i) the existence of offers for the property significantly higher than the offer from Oberfeld that they advised Sweetwater to accept, (ii) that Oberfeld was unable or unwilling to close the purchase if he was unable to not find investors and other third party financing, (iii) that Defendants had been offered additional consideration by Oberfeld and other offerors, and (iv) the nature and existence of arrangements that would give them secret profits or consideration beyond their disclosed commissions.

59.  As alleged above, Defendants knew the falsity of these misrepresentations and non-disclosures, and made them with the intent to induce Defendants to proceed with and close the sale of the Property to Oberfeld at the price he offered with a $1 million repair credit.

60. Sweetwater was unaware of the falsity of these representations or of the facts that were not disclosed and relied on such representations and non-disclosures in accepting the offer from Oberfeld and closing the sale to him.

61. As a proximate and legal result, Sweetwater has been damaged in an amount to be proven at trial.

62. Defendants acted with fraud malice and oppression, entitling Sweetwater to recover punitive or exemplary damage in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### (Negligent Misrepresentation)

63. Plaintiff hereby incorporates in this cause of action paragraphs 1 through 62 inclusive above as though fully set forth herein.

64. As alleged in greater detail above, Defendants misrepresented material facts and failed to disclose material facts they had duty to disclose, that were material to the sale.

65. In the alternative, Defendants made the foregoing misrepresentations and non-disclosures without a reasonable basis, and with the intent to induce Defendants to proceed with and close the sale of the Property to Oberfeld

66. Sweetwater was unaware of the falsity of these representations or of the facts that were not disclosed and relied on such representations and non-disclosures in accepting the offer from Oberfeld and closing the sale to him.

67. As a proximate and legal result, Sweetwater has been damaged in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### (Negligence and Negligence Per Se)

68. Plaintiff hereby incorporates in this cause of action paragraphs 1 through 67 inclusive above as though fully set forth herein.

69. As professional licensed real estate brokers, Defendants had the duty to exercise reasonable care commensurate with their professional licensure, skill and training, in carrying out their duties as Sweetwater's broker in selling the property. Defendants also held themselves out as

having greater experience and skill than other brokers, who could be entrusted with the sale of extremely valuable properties, and charging above-market commissions for their services, thereby imposing on themselves an even higher standard of care.

70. Defendants also were subject to various laws regulating the activities of licensed real estate brokers, that were intended to protect sellers of property who use the services of real estate brokers, including (i) California Business & Professions Code section 10176 prohibiting making of any "substantial misrepresentation" and "claiming or taking by a licensee of any secret or undisclosed amount of compensation, commission, or profit or the failure of a licensee to reveal to the employer of the licensee the full amount of the licensee's compensation, commission, or profit," and California Civil Code section 2079.16 providing that, in order to represent both buyer and seller in a real estate transaction, a licensed broker must fully disclose all arrangements to both parties and obtain their informed consent, and owes a fiduciary duty of the utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer, including a duty to disclose to the seller material facts affecting the transaction.

71. As set forth above, Defendants failed to exercise due care and breached these statutory duties by, among other things, (i) negligently seeking, negotiating and recommending offers for the property, which could have been sold for significantly more had they exercised the appropriate standard of care, (ii) failing to advise Plaintiff of the opportunity to sell the property at higher prices, (iii) advising Plaintiff not to terminate the sale to Oberfeld due to his breaches and instead advising Plaintiff to waive those breaches, and (iv) advising Plaintiff to agree to a $1.3 million repaid credit instead of terminating for failure to waive the inspection contingency.

72. As a proximate and legal result of Defendants' breaches, Sweetwater has been damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF:**

Plaintiff Sweetwater Malibu CA, LLC prays as follows:

1. For damages in an amount to be proven at trial;
2. For disgorgement of profits;
3. For punitive or exemplary damages according to proof;
4. For costs of suit; and
5. For such other relief as is deemed appropriate at trial.

DATED: March 13, 2019

By: *Kevin Fisher* (signature)
Kevin Fisher
Attorneys for Plaintiff
SWEETWATER MALIBU CA, LLC