Kevin Fisher (State Bar No. 131455)
Praxis Law
P.O. Box 26249
Los Angeles, CA 90026
Telephone: (310) 862-1225
Facsimile: (310) 388-0805
rkf@fkslaw.net

Julian Brew (State Bar No. 150615)
Cypress, LLP
11111 Santa Monica Boulevard, Suite 500
Los Angeles, CA 90025
Telephone: (424) 317-6220
Facsimile: (424) 750-5100
julian@cypressllp.com

Attorneys for Plaintiff
SWEETWATER MALIBU CA LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SWEETWATER MALIBU CA, LLC, a California limited liability company,<br><br>        Plaintiff,<br><br>  vs.<br><br>MAURICIO UMANSKY; UMRO REALTY CORP., a California corporation, dba THE AGENCY,<br><br>        Defendants. | Case No. 2:19-CV-01848-GW-SS<br><br>**OPPOSITION OF PLAINTIFF SWEETWATER MALIBU CA LLC TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date: June 3, 2019<br>Time: 8:30 a.m.<br>Place: Courtroom 9D, 9th Floor<br>Judge: Hon. George H. Wu<br><br>Date of Filing: Mar. 13, 2019<br>Trial Date: None Set |

Plaintiff Sweetwater Malibu CA, LLC, formerly known as Sweetwater Malibu, LLC ("Sweetwater"), submits this Opposition to the Motion to Dismiss filed by defendants Mauricio Umansky ("Umansky") and UMRO Realty Corp. doing business as The Agency (the "Agency") (collectively, "Defendants").

# Table of Contents

II.      INTRODUCTION                                                                 - 1 -

III.     STATEMENT OF FACTS                                                  - 2 -

IV.      ARGUMENT                                                                    - 9 -

    A.   Sweetwater Has Standing To Sue Defendants.                  - 9 -

        1.   Sweetwater Has De Facto Standing As A Contracting Party To Sue For Deprivation Of Its Contractual Rights Without Further Injury.   - 11 -

        2.   Plaintiff Has Suffered Tangible Losses Of Money And Property.   - 12 -

        3.   Sweetwater Has Standing To Sue Due To Intangible Injuries It Suffered Caused By Defendants' Egregious Wrongdoing.   - 13 -

        4.   Plaintiff Would Have Standing To Sue Even If All Proceeds Recovered Must Be Used For The Benefit Of Third Parties.   - 14 -

        5.   Sweetwater Has Standing To Sue For Losses To Any Third Parties Who May Receive Proceeds Of The Sale Taken by Defendants.   - 16 -

    B.   Sweetwater Has Not Waived Its Claims Against Defendants.   - 17 -

V.       CONCLUSION                                                               - 20 -

OPP TO MOTION TO DISMISS
2:19-CV-01848-GW-SS

**Table of Authorities**

**Cases:**

*A&T Siding, Inc. v. Capitol Specialty Ins. Corp.,*
 2011 WL 3651777 (D. Ore. 2011) ……………………………………………… 15

*Allabach v. Santa Clara County Fair Assn.*
 (1996) 46 Cal.App.4th 1007……………………………………………………18

*Biomed Pharm. Inc. v. Oxford Health Plans (N.Y.) Inc.*
 2011 WL 803097 (S.D.N.Y. Feb. 18, 2011) ………………………………….. 11

*Blankenheim v. E.F. Hutton & Co.,*
 (1990) 217 Cal.App.3d 1463………………………………………………………16

*Clinton v. City of New York,* 524 U.S. 417 (1998) ……………………………………12

*DiCarlo v. St. Mary Hosp.,* 530 F.3d 255 (3d Cir. 2008) …………………………………11

*Katz v. Pershing, LLC,* 672 F.3d 64 (1st Cir. 2012) …………………………………………11

*Kowalski v. Tesmer,* 543 U.S. 125, 130 (2004) ……………………………………...16

*Linton by Arnold v. Comm'r of Health and Env't State of Tenn.,*
 973 F. 2d 1311 (6th Cir. 1992) …………………………………………………11

*Little v. Shell Exploration & Production Co.,*
 690 F. 3d 282 (5th Cir. 2012) …………………………………………………...15

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992)……………………………………….9

*Manderville v. PCG&S Group, Inc.* (2007) 146 Cal.App.4th 1486……………………… 16

*Mitchell v. Blue Cross Blue Shield of North Dakota,*
 2018 WL 3463260 (D. N.D. July 18, 2018) …………………………………………15

*Neubauer v. Goldfarb* (2003) 108 Cal. App. 4th 47…………………………………………16

*North Cypress Medical Center Operating Co., Ltd. v.*
 *Cigna Healthcare,* 781 F.3d 182 (5th Cir. 2015) ………………………………11, 15

*Pacific Sound Resources v. Burlington Northern and Santa Fe Ry. Co.*
 286 Fed. Appx. 381 (9th Cir. 2008) …………………………………………………15

*Robins v. Spokeo, Inc.,* 867 F.3d 1108 (9th Cir. 2017) ………………………………...13

*Simmons v. Ratterree Land Co.* (1932) 217 Cal. 201……………………………………… 16

*Smith v. Org. of Foster Families for Equality & Reform,*
 431 U.S. 816 (1977) ……………………………………………………………16

*Smith v. Rickards* (1957) 149 Cal.App.2d 648………………………………………16

*Spinedex Physical Therapy USA, Inc. v. UnitedHealth Care of*
 *Arizona, Inc.,* 770 F. 3d 1282 (9th Cir. 2014) …………………………………………..11

*Spokeo, Inc. v. Robins,* 136 U.S. 1540, 1551 (2016) …………………………………………...11

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.,* 554 U.S. 269 (2008)………………………...9, 15

*United States v. $8,720 in U.S. Currency* ("*$8,720 in U.S. Currency*"),
 264 F.3d 1140, 1140 (5th Cir. 2001) ……………………………………………………9

*United States v. Grover,* 119 F.3d 850, 851 (10th Cir. 1997) …………………………………9

*United States v. Stokes,* 191 F. Appx. 441, 442-43 (7th Cir. 2006) ………………………………9

**Statutes:**

Cal. Civ. Code § 1542………………………………………………………………………18

Cal. Civ. Code § 1668………………………………………………………………………18

OPP TO MOTION TO DISMISS
2:19-CV-01848-GW-SS

# I.   INTRODUCTION

Defendants Mauricio Umansky and The Agency ("Defendants") seek to avoid the overwhelming evidence of their egregious fraud, statutory violations, breaches of contractual, fiduciary and statutory duties and other wrongdoing, while they hide behind inapplicable defenses they claim give them a "get out of jail free" card.  As shown below, their arguments are so lacking in merit and contrary to the facts and controlling authority that they could have been raised for just one purpose – to create a diversion from the damning truth of what they did.

Defendants spend much of their brief regurgitating old disputed and disproven allegations against Sweetwater's owner Teodoro Ngeuma Obiang Mangue, the Vice President of Equatorial Guinea.  Defendants fail to disclose in their public filing that their most inflammatory allegations were rejected by this Court, leaving only an allegation that Nguema or his agents failed to provide certain information to a bank concerning ownership of related entities.  This Court held that "the Government lacked probable cause to institute a forfeiture action against the Defendant Assets on the basis of the foreign offenses [alleged in the action]." (*United States v. One Michael Jackson Signed Thriller Jacket,* CV 13-9169, Docket No. 105, August 20, 2013 Ruling).  The remaining issue was dismissed as part of a settlement that admitted no wrongdoing.

Defendants admit these old allegations against Obiang are irrelevant.  They apparently cited them not to support their arguments on standing, but to play to and mislead their other clients and the public.  The truth, however, always has a way of rising to the top.

Nguema agreed to the settlement after the Court dismissed most of the allegations against him so he could amicably resolve disputes with the United States Government, avoid further cost and move on, as is true with countless settlements every day that, as a matter of law, are neither evidence nor admission of culpability.  Nguema and Sweetwater agreed to a ***mutually beneficial*** resolution that allowed proceeds from the sale to be used as decided jointly by him and the DOJ to benefit his country, a purpose he shares and supports.  Defendants' fraud and other wrongdoing harmed Sweetwater and undermined the settlement by diverting money that should have been used for that agreed purpose.  Instead of being used to help the people of Nguema's country, the money lined the pockets of an already wealthy celebrity broker and his friends.

1    In stark contrast to these disproven and unproven accusations that have been dismissed,

2  Sweetwater alleges serious, detailed and well-documented claims for fraud, diversion of profits,

3  self-dealing, statutory violations and other wrongdoing that Defendants do not even mention, yet

4  alone dispute, in their motion.  For purposes of this motion, Defendants admit they intentionally

5  lied to their client Sweetwater, deceived the United States Government, stole millions of dollars in

6  secret profits that should have gone to their client, violated statutes governing their profession, the

7  Settlement Agreement and the Court's Order, and committed breaches of contract and fiduciary

8  duties.  By filing this motion, Defendants seek to avoid answering the complaint, which would

9  require them to admit or deny each of Sweetwater's detailed allegations of fact, truthfully and in

10  good faith as required by Federal Rule of Civil Procedure 11.

11    While Defendants' inflammatory and false accusations are irrelevant to this motion, they

12  confirm that Defendants intentionally diverted millions of dollars to themselves and their partners

13  in the cynical but mistaken belief that no one would notice or care.  They were wrong.  After press

14  reports of Defendants' flip of the property for double the price less than a year later that referred to

15  Umansky as a "partner" with the buyer he recommended, Nguema demanded an explanation and

16  evidence that revealed the betrayal.  He did so because Defendants' wrongdoing deprived him of

17  tangible and intangible benefits of the Listing and Settlement Agreements, and it was of great

18  importance and value to him that the all proceeds be used as agreed.

19    Controlling authority that Defendants fail to cite establishes Sweetwater's standing to

20  pursue these claims, to recover its own losses and money to be used as determined by Nguema in

21  conjunction with the DOJ, to benefit his country.  Defendants' argument that Sweetwater and the

22  United States agreed, and this Court approved and ordered, that Defendants would face no liability

23  or consequences for any wrongdoing they committed in selling the property is contrary to the

24  language of the Settlement Agreement and governing law.

25  ## II.    STATEMENT OF FACTS

26    On April 28, 2011, the United States filed an action, seeking among other things civil

27  forfeiture of the property located at 3620 Sweetwater Mesa Drive in Malibu (the "Property") and

28  certain other assets owned by Nguema and related entities, based on ***allegations*** that they had been

1   purchased using money obtained through foreign corruption and other wrongdoing (the "Action").

2   (Complaint, ¶ 14).  In their Motion, Defendants misleadingly quote several of these **_allegations_** of

3   foreign corruption, including extortion, embezzlement and bribery, from the complaint in the civil

4   asset forfeiture action.  (Motion at 1-3).  However, they fail to mention that, after evaluating the

5   **_evidence,_** this Court granted summary judgment **_dismissing_** those allegations in Nguema's favor

6   because they were made **_without even probable cause_**.

7           The Court GRANTS IN PART Claimant's motion for an order that, as of

8           April 28, 2011, the Government lacked probable cause to institute a forfeiture

9           action against the Defendant Assets on the basis of the foreign offenses

10           identified in the Second Amended Complaint ("SAC"), Docket No. 50.  *See,*

11           *e.g.,* SAC ¶ 16.  In other words, the Court finds that the assets are not subject to

12           forfeiture as proceeds of foreign offenses involving: (1) "extortion," (ii) "the

13           misappropriation, theft, or embezzlement of public funds by or for the benefit of

14           a public official," or (iii) bribery of a public official.  These specified unlawful

15           activities (*see, e.g.,* 18 U.S.C. § 981(a) and 18 U.S.C. § 1956(c)(7),

16           incorporating by reference offenses enumerated in 18 U.S.C. § 1961(1)), are not

17           sufficiently supported by probable cause and cannot serve as the basis for

18           forfeiture of the Defendant Assets

19   (August 20, 2013 Minute Order).  This left only the issue of whether or not Nguema or his agents

20   failed to provide information about certain entities in opening bank accounts.  (*Id.*)

21           After Nguema prevailed on most of the claims against him, he and the United States chose

22   to make peace through an amicable, mutually beneficial settlement so Nguema could avoid further

23   expense and a distraction from his duties from having to litigate in a distant forum.  On October 9,

24   2014, the parties entered into the Settlement Agreement, resolving the remaining claim, with no

25   admission of liability and no forfeiture of the Property.  (Weisberg Dec., Ex. 2).

26           Rather than the forfeiture of the Property to the United States that had been sought in the

27   Action, the parties agreed that Sweetwater would continue to hold title and sell the Property using

28   a licensed broker.  (*Id.*, ¶¶ 2, 6-19).  The parties also reached agreement on how the proceeds of

1   the sale would be used, with only a portion of them forfeited to the United States.  (*Id.*, ¶ 32).  The

2   remainder would be paid (i) to reimburse Sweetwater and other parties for expenses incurred in

3   connection with the sale, including maintenance of the Property, and (ii) to a mutually agreed on

4   charity or a panel, that included individuals chosen by Nguema, Equatorial Guinea and the DOJ to

5   use the funds to provide benefits to the people of his country.  (*Id.*, ¶ 27).

6          Contrary to Defendants' mischaracterization of the agreement, neither the Property nor the

7   proceeds for charities were forfeited to the United States.  In addition, while Nguema agreed some

8   of the proceeds would be used for charitable purposes that benefit the people of Equatorial Guinea

9   rather that going to him personally, he retained an interest and role in how the funds were used for

10  his country's benefit.  Charities would be selected by Nguema and the United States jointly, or by

11  a three-member panel that included members selected by the Republic of Equatorial Guinea and

12  one jointly by Nguema and the United States.  (*Id.*, ¶ 26).  Any charities they chose were required

13  to provide regular reports to Nguema as to how the funds were being used, so he could monitor the

14  uses.  (*Id.*, ¶ 30).  If Nguema and DOJ could not agree on the charities or panel chairman, Nguema

15  had the right to ask this Court to assist in the resolution, as he has recently done, demonstrating his

16  continuing interest in how the remaining proceeds are used.  (*Id.,* ¶ 26).

17         The United States' agreement that all proceeds from the sale of the Property would not be

18  forfeited to the United States but used for the benefit of the people of his country was a key reason

19  why Nguema agreed to settle, because it allowed him to jointly decide how the money would be

20  used, and ensured it would be used to benefit his country, a purpose that he shares and supports

21  and provides intangible but valuable personal satisfaction and benefit to him as its Vice President.

22  So important was the use of the funds to him that the Settlement Agreement also provided that

23  even the portion that was forfeited to the United States had to be used to benefit his people, and

24  not simply go to the United States Government.  (*Id.,* ¶ 34).

25         The Settlement Agreement was filed in the Action, and the Court entered an Order on

26  October 13, 2014 (the "Order"), ordering each party to "cooperate with the other(s) to perform the

27  acts required by the Settlement Agreement, and refrain from taking any action that is inconsistent

28  with the Settlement Agreement."  (Compl., ¶ 14).

1    The Settlement Agreement and Order together provided that ***Sweetwater and Nguema***

2  would enter into a Listing Agreement with a licensed real estate broker who had been approved by

3  Sweetwater, Nguema and the DOJ to list and sell the Property, and that the contract "will require

4  that the Licensed Agent review and comply with the provisions of this Settlement Agreement."

5  (Weisberg Dec., Ex. 2, ¶¶ 7, 8).  The Settlement Agreement also required the Licensed Agent "to

6  work cooperatively with the United States in the conduct of its activities, including reporting

7  regularly to the United States and providing all requested information promptly to the United

8  States relating to the [property] and its sale."  (*Id.,* ¶¶ 8-9).

9    The Settlement Agreement and Order required that the Property "will be sold in

10  accordance with the terms of this Settlement Agreement for fair-market-value ('FMV'), as that

11  term is defined pursuant to California Code of Civil Procedure Section 1263.320, unless a sale at

12  an alternative price is approved in writing by both counsel for the United States and counsel for

13  Nguema, in arm's length transactions. . ."  (*Id.,* ¶ 6).

14    Section 1263.320 defines fair market value as "the highest price on the date of valuation

15  that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity

16  for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no

17  particular necessity for so doing, each dealing with the other with full knowledge of all the uses

18  and purposes for which the property is reasonably adaptable and available."

19    Defendants are high-end licensed real estate brokers, who hold themselves out as the

20  "preeminent player in the luxury real estate market, representing many of the country's most

21  visible and high-end properties."  Defendants tout to their prospective clients their "knowledge,

22  spheres of influence, contacts and expertise, ensuring our clients better representation and a true

23  competitive edge."  Umansky personally promotes himself "as the #3 top-producing real estate

24  agent in the U.S. and #1 in California," as having sold the most homes in the country above $20

25  million, and his representation of celebrities and very wealthy individuals.  He also is married to

26  one of the "Beverly Hills Housewives," and has frequent appearances on the show, adding to his

27  carefully cultivated persona and reputation as a premier broker.  (Compl., ¶ 18).

28    In 2015, pursuant to the Settlement Agreement and Order, Defendants entered into an

- 5 -

1  exclusive listing agreement (the "Listing Agreement") with Sweetwater, which provided for a

2  commission of 6% of the sale price – higher than the typical amount of 5% or less.  (*Id.*, ¶ 19).

3  Sweetwater agreed based on Umansky's reputation and the belief he could be trusted to get the

4  best possible price.  The Listing Agreement obligated Defendants to comply with the Settlement

5  Agreement, and provided that the "Settlement Agreement provisions will prevail in the event any

6  of them conflict with the terms in this Agreement."   While Defendants agreed to comply with the

7  Settlement Agreement, their only client was Sweetwater, which owned the property and had sole

8  discretion to agree to any sale over an appraised value of $32.5 million.  (*Id.*)

9      After entering into the Listing Agreement, Umansky presented offers from several

10  potential buyers, most of whom were also his friends and clients, thereby entitling Defendants to

11  the full 6% commission.  All the offers were supposedly in the range of $32 to $33.5 million.  At

12  Umansky's recommendation, Sweetwater countered to all at $33.5 million instead of higher.  Of

13  those who accepted, Umansky pressed Sweetwater to proceed with one of his clients, Mauricio

14  Oberfeld, instead of a non-client who also offered $33.5 million and likely would have paid more.

15  Sweetwater followed this advice and accepted Oberfeld's offer.  (*Id.*, ¶¶ 20, 21).

16      Sweetwater has since learned that, despite making an "as is" cash offer, Oberfeld in fact

17  did not have the funds to close the purchase, and was already searching for a loan and investors to

18  help pay the purchase price, or another buyer to whom to flip the property.  Umansky was well

19  aware of this information before presenting the offer that specifically stated there would be no

20  third-party financing but did not disclose it to Sweetwater.  Indeed, Defendants were already

21  actively helping Oberfeld find buyers and investors.  (*Id.*, ¶ 22).

22      Umansky also failed to disclose to Sweetwater that the agent for Sam Hakim, whose offer

23  was accepted as a backup at his recommendation, had agreed in writing to kick back to Umansky

24  one third of his share of the commission as secret profits.  Neither the offer nor signed addendum

25  to the offer confirming the kickback were disclosed to Sweetwater.  Umansky wrote in response:

26  "Received.  You are a man of your word.  I truly hope that you get picked."  Rather than rely on

27  "hope," Umansky urged Sweetwater to accept Hakim's backup offer.  (*Id.*, ¶ 23).

28      Even more troubling, Umansky was helping Oberfeld find investors and buyers, and

1  received offers to pay millions more for the Property than Oberfeld.  Umansky did not deliver

2  these offers to his client and Property owner Sweetwater, but secretly passed them to Oberfeld,

3  who did not yet own the Property, had not paid the required deposit or satisfied contingencies, and

4  could not complete the sale without finding investors or another buyer, as Umansky knew but

5  failed to disclose to Sweetwater or the United States Government.  (*Id.*, ¶ 24).

6      Umansky's deception was subsequently discovered in documents he turned over to

7  Sweetwater's counsel long after the close.  For example, on December 23, the very day that he

8  Umansky wrote Oberfeld to tell him his offer had been picked. Oberfeld responded: "Fantastic.

9  Moe, how did it go w your guy."  Umansky quickly responded: "Very well.  He might take it off

10 *our* hands.  *I pitched it for 42*."  In other words, by the time Umansky had persuaded Sweetwater

11 to accept Oberfeld's "all cash" and "no contingency" offer at $33.5 million, he had already been

12 secretly discussing sale to a third party for almost $10 million more.  (*Id.*, ¶ 25).

13     In February 2016, Umansky received a written offer from the backup offeror for $8 million

14 over Oberfeld's offer, with 4% going to Umansky as a commission.  Umansky presented the offer

15 to Oberfeld, but not Sweetwater, which still owned the property.  Umansky sent the other buyer a

16 counter offer of $15 million on behalf of Oberfeld, with the same 4% commission to Defendants

17 on the resale or "flip," which he also failed to disclose.  (*Id.*, ¶ 26).

18     Not only did Defendants fail to disclose these other higher offers or that Oberfeld needed

19 to find investors to close, but they also urged Sweetwater to waive the required $1 million deposit,

20 claiming "the Buyer is concerned about having 1 Million dollars tied up indefinitely" and it would

21 not be possible to find another buyer for the property, when they knew the real reason was because

22 Oberfeld had not yet raised enough money.  Sweetwater agreed in reliance on this advice.  By this

23 fraud, with Umansky's help, Oberfeld tied up a $33.5 million property without a cent at risk, while

24 the seller's own broker and fiduciary helped the buyer find a buyer of his own.  (*Id.*, ¶ 27).

25     With the deadlines for various contingencies and closing rapidly approaching, Umansky

26 repeatedly urged Sweetwater to extend the contingency period and close of escrow, in contrast to

27 his advice to accept Oberfeld's offer because of the supposed urgency in closing before March.

28 While he and Oberfeld secretly worked to flip the property, Umansky fraudulently persuaded

1   Sweetwater to agree to several extensions without disclosing these efforts.  (*Id.*, ¶ 28).

2          In April, Umansky was still helping Oberfeld find investors or buyers so he could complete

3   the purchase.  Despite having agreed to buy the property "as is," Oberfeld requested a $1 million

4   repair credit.  Instead of telling Sweetwater it could deny the request and other buyers had offered

5   to pay millions more, Umansky assured Oberfeld he was pushing his client Sweetwater "so hard"

6   (Umansky's own words) to agree to the credit.  Sweetwater reluctantly agreed, benefiting both the

7   buyer and anyone else benefiting from the flip, including Umansky.  The United States has taken

8   the position that Sweetwater is itself liable for this $1 million.  (*Id.*, ¶ 29).  Even if Nguema can

9   successfully challenge this claim, he will have to incur fees and expenses to fight it.

10          Just two weeks before the close, with contingencies cleared and the deed signed by

11   Sweetwater, Umansky wrote the Department of Justice that Oberfeld just "invited me to invest

12   with him" and "to express my intention of making an investment with Mauricio Oberfeld into the

13   deal."  Three days later, Umansky wrote an e-mail to Sweetwater on several topics.  Towards the

14   end of the e-mail Umansky wrote, "for the sake of full disclosure . . . Mauricio [Oberfeld] invited

15   me to invest about one month ago after we removed all contingencies [and] I do intend to make an

16   investment with them."  This "full disclosure" was anything but and constituted a further fraud.

17   This "disclosure" was not made until it too late for Sweetwater to get out of the sale to Oberfeld,

18   and conspicuously omitted from the email was any disclosure of Umansky's other secret dealings,

19   financial interests, and conflicts outlined above.  (*Id.*, ¶ 30).

20          In mid-2017, less than a year after the close of the sale to Oberfeld and his "partners,"

21   including Umansky, they resold the property for $69.9 million, more than double what they had

22   paid.  An earlier article stated that: "Oberfeld **bought** the neglected property, on Sweetwater Mesa

23   Road, in **partnership** with Mauricio Umansky, co-founder of luxe brokerage the Agency, last year,

24   records show."  It cited sources stating that "the **partners** are likely to make a hefty profit, since

25   they acquired the property for a **massive discount**."  The Agency website also referred to Oberfeld

26   as one of its "partners," and featured him posing with Umansky.  (*Id.*, ¶ 31).

27          While Defendants apparently thought and hoped no one would notice or care, they were

28   wrong.  After reading press reports, Sweetwater's counsel wrote to Umansky and The Agency to

- 8 -

1   demand additional information about his involvement in the transactions.  The documents that

2   were obtained by Sweetwater revealed some of Defendants' duplicitous, fraudulent and wrongful

3   conduct that had been concealed by Defendants.  This lawsuit followed.

4   ### III.     ARGUMENT

5   Defendants seek dismissal based on (i) purported lack of standing, and (ii) the outrageous

6   claim that the Settlement Agreement pursuant to which he was retained by Sweetwater shielded

7   them from any liability for any misconduct in connection with the sale of the Property.  These

8   arguments are directly contrary to the facts and controlling authority.

9   ### A.  Sweetwater Has Standing To Sue Defendants.

10  To satisfy the Article III standing requirement, a plaintiff must establish:  "(1) an injury in

11  fact (i.e., a 'concrete and particularized' invasion of a 'legally protected interest'); (2) causation

12  (i.e., a 'fairly ... trace[able]' connection between the alleged injury in fact and the alleged conduct

13  of the defendant); and (3) redressability (i.e., it is 'likely' and not 'merely speculative' that the

14  plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)." *Sprint Commc'ns*

15  *Co., L.P. v. APCC Servs., Inc.,* 554 U.S. 269, 273-74 (2008) (quoting *Lujan v. Defenders of*

16  *Wildlife,* 504 U.S. 555, 560–61 (1992)).

17  Defendants base their standing argument on a misconstruction of the Settlement

18  Agreement, which they claim resulted in an immediate forfeiture by Sweetwater of its interest in

19  the Property, so that it had no property interest in its sale.  This is based on cases involving a plea

20  of guilty or an adjudication that assets were forfeited.  *See United States v. Stokes,* 191 F. Appx.

21  441, 442-43 (7th Cir. 2006) (guilty plea and agreement to forfeit assets barred claim for recovery

22  of those assets); *United States v. $8,720 in U.S. Currency* ("*$8,720 in U.S. Currency*"), 264 F.3d

23  1140, 1140 (5th Cir. 2001) (guilty plea and agreement to forfeit funds precluded subsequent effort

24  to recover the forfeited funds); *United States v. Grover,* 119 F.3d 850, 851 (10th Cir. 1997)

25  (agreement to forfeit property barred future claim challenging forfeiture).

26  These cases stand for the unremarkable proposition that to move under Federal Rule of

27  Criminal Procedure 41(e) to recover property that has been forfeited by agreement or guilty plea, a

28  plaintiff must establish a right to possession of the property.  *See Grover,* 119 F. 3d at 851 ("Rule

1    41(e) provides: 'A person aggrieved by an unlawful search and seizure or by the deprivation of

2    property may move the district court for the district in which the property was seized for the return

3    of the property on the ground that such person is entitled to lawful possession of the property.'")

4    They are completely inapplicable here because (i) Sweetwater did not agree to a forfeiture of the

5    Property but agreed to sell the Property and disburse the proceeds in a manner to be agreed by

6    Nguema and the DOJ, and (ii) Sweetwater is not suing to recover the Property.

7        The Property was not forfeited to the Government.  Rather, it was sold by Sweetwater by

8    agreement with the U.S. Government to settle disputed claims.  As shown above, the Settlement

9    Agreement and Order and make clear that the Property was not forfeited.  (Weisberg Dec., Ex. 2,

10   ¶¶ 2, 6-19).  If the Property had been forfeited, then Sweetwater could not have sold it, or entered

11   into a contract with Defendants to do so.  To the contrary, the DOJ agreed it would do both.  The

12   only property forfeited was a $10,300,000 payment to the Government out of the proceeds of any

13   sale.  (*Id.*, ¶ 32).  The remaining proceeds after payments to the United States and reimbursement

14   to Nguema, also were not forfeited.  The Settlement Agreement provided that all other proceeds of

15   a sale would be used as decided by Nguema and the Government jointly to fund charities selected

16   to benefit the people of Nguema's country, Equatorial Guinea.  (*Id.*, ¶¶ 26, 30)

17        Nor does the Settlement Agreement assign Sweetwater's claim to any third party.  Indeed,

18   no charity has been selected to receive any proceeds from this lawsuit, nor can a charity be chosen

19   to receive funds recovered in this lawsuit until they are recovered.  The cynicism of Defendants'

20   use of standing rules here is vividly demonstrated by the fact that they do not and cannot identify

21   anyone other than Sweetwater who could pursue these claims.  Indeed, even if charities had been

22   selected, the same argument Defendants make would deny them standing because they would be

23   obligated to spend the money to benefit the people Equatorial Guinea.  Defendants are not arguing

24   lack of standing to ensure the "right" party brings this lawsuit, but to avoid facing these claims

25   from the one and only party who has the legal right to pursue them.

26        Under established principles, Sweetwater has standing to sue because (i) a contracting

27   party has *de facto* standing to sue for breach of contract against the other contracting party based

28   solely on deprivation of contractual rights, (ii) Sweetwater also suffered direct monetary and other

OPP TO MOTION TO DISMISS
2:19-CV-01848-GW-SS

tangible losses from Defendants' wrongdoing, (iii) Sweetwater also suffered intangible harm from Defendants' wrongdoing, (iv) the Supreme Court has specifically held standing is not lost because plaintiff may be obligated to pay to a third party any proceeds it may recover in the litigation, and (v) Sweetwater also has standing based on losses to third parties because of its close relationship to those third parties and the undisputable barriers to them bringing suit.

## 1. **Sweetwater Has De Facto Standing As A Contracting Party To Sue For Deprivation Of Its Contractual Rights Without Further Injury.**

Sweetwater's status as contracting party with Defendants gives it *de facto* standing to sue for the deprivation of contractual rights, regardless of whether it also suffered additional intangible or tangible monetary loss as a result.  *See North Cypress Medical Center Operating Co., Ltd. v. Cigna Healthcare,* 781 F.3d 182, 193 (5th Cir. 2015); *Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012) ("[W]e think the better view is that when a plaintiff generally alleges the existence of a contract, express or implied, and a concomitant breach of that contract, her pleading adequately shows an injury to her rights"); *Spinedex Physical Therapy USA, Inc. v. UnitedHealth Care of Arizona, Inc.,* 770 F. 3d 1282 (9th Cir. 2014);  *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 263 (3d Cir. 2008); *Linton by Arnold v. Comm'r of Health and Env't State of Tenn.*, 973 F.2d 1311, 1317 (6th Cir. 1992); *Biomed Pharm. Inc. v. Oxford Health Plans (N.Y.) Inc.,* 2011 WL 803097 (S.D. N.Y. Feb. 18 2011) (defendant health plan "failed to fulfill its contractual obligations to the Patient; this is all that is required to demonstrate Article III standing").

The *Spokeo* decision on which Defendants rely involved violations of statutes for the public benefit, not deprivation of private contractual rights.  As Justice Thomas's concurrence in *Spokeo* acknowledged, unlike the "public" rights at issue there, "'private rights' have traditionally included rights of personal security (including security of reputation), property rights and ***contract rights***.  In a suit for the violation of a private right, courts historically presumed that the plaintiff suffered a *de facto* injury merely from having his personal, legal rights invaded."  *Spokeo, Inc. v. Robins,* 136 U.S. 1540, 1551 (2016) (Thomas, Concur.) (emphasis added).  In contrast to "public rights" addressed in *Spokeo*, actions to enforce private rights, such as contract rights, require no further injury beyond deprivation of those rights to establish standing:

But the concrete-harm requirement does not apply as rigorously when a private plaintiff seeks to vindicate his own private rights. ***Our contemporary decisions have not required a plaintiff to assert an actual injury beyond the violation of his personal legal rights*** to satisfy the "injury-in- fact" requirement. *See, e.g., Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (holding that nominal damages are appropriate when a plaintiff's constitutional rights have been infringed but he cannot show further injury).

*Id.* at 1552 (emphasis added).  In other words, as extensive precedent holds, a party who sues for breach of contract suffers "injury" for Article III standing purposes simply from deprivation of its contractual rights bargained for under the agreement defendant breached.

Sweetwater was the direct contracting party with Defendants, as specifically authorized by the Settlement Agreement, and entitled to several contractual rights under that Listing Agreement, including the right to truthful information, loyal services, sale to the highest bidder of its choice and other rights it was deprived of by Defendants' wrongdoing.  Sweetwater has standing to sue for the deprivation of what it contracted for under the Listing Agreement.  Sweetwater also was deprived of benefits under the Settlement Agreement that Defendants were obligated to provide, including fair market value for the Property, honest services and advice, and additional proceeds it could have used to benefit the people of his country, not pad the bank accounts of a celebrity real estate broker and his very wealthy friends thousands of miles away.

### 2.  Plaintiff Has Suffered Tangible Losses Of Money And Property.

As Defendants concede and the Complaint specifically alleges, the DOJ has made a claim against Sweetwater for the $1 million repair credit that Defendants induced Sweetwater to accept by its intentional fraud and breaches of statutory, contractual and fiduciary duties.  (MTD at 7; Compl., ¶ 29.)  The fact that the claim by the United States against Sweetwater has not yet been adjudicated, and therefore is contingent on a final adjudication, does not eliminate Sweetwater's standing based on the claim, as the claim it faces itself constitutes a tangible "harm" for purposes of Article III standing.  *See Clinton v. City of New York,* 524 U.S. 417 (1998).

1      The United States has already notified Defendants that it considers Sweetwater liable for

2   the $1 million repair credit.  Regardless of whether this Court ultimately agrees, Sweetwater and

3   Nguema already know they will have to expend time and resources to litigate this claim, including

4   attorneys' fees, or they will continue to bear the exposure.  Defendants' argument, for which they

5   cite no authority, that the existence of an actual, albeit unadjudicated, claim for this money does

6   not constitute immediate or imminent harm for standing purposes, is without merit.

7      Sweetwater also alleges that it was induced by Defendants' fraud, breach of duties and

8   other wrongdoing to prematurely transfer its title to the Property to Oberfeld, instead of retaining

9   title until it was sold to another superior buyer.  Contrary to the Motion, Sweetwater did not forfeit

10   title to the Property prior to its sale, but, as the Settlement Agreement acknowledged, retained title

11   and the right to sell the Property, until it was sold to a buyer of its choice.  Therefore, Sweetwater

12   has also alleged a direct, premature deprivation of its ownership of the Property.

13      Only the most cynical and self-serving defendant would argue that defrauding a property

14   owner to prematurely sell his valuable property for a less desirable price to a buyer it otherwise

15   would not have chosen suffers no harm from the fraud and other wrongdoing that caused the sale,

16   just because it agreed to spend the money to help others.   While not necessary for standing for the

17   reasons set forth herein, these personal monetary and property harms clearly constitute injuries in

18   addition to the deprivation of its contractual rights and benefits under the Listing Agreement for

19   purposes of Article III standing, and independently require denial of this motion.

20          **3.  <u>Sweetwater Has Standing To Sue Due To Intangible Injuries It Suffered</u>**

21             **<u>Caused By Defendants' Egregious Wrongdoing.</u>**

22      While relying heavily on the Supreme Court's *Spokeo* decision that remanded to the Ninth

23   Circuit for further proceedings, Defendants do not address the Ninth Circuit's decision on remand,

24   for which the Supreme Court denied *certiorari* and that therefore is binding and controlling, that

25   even for a bare statutory violation resulting in no tangible injury, ***intangible*** harm is sufficient to

26   establish standing.  *See Robin*s *v. Spokeo, Inc.*, 867 F.3d 1108, 1112 (9th Cir. 2017), *cert. denied*

27   138 S. Ct. 931 (2018).  Intangible harm can include reputational damage, the fact that inaccurate

28   information may be reported about plaintiff, or similar non-monetary harms.  *Id.*

1    The sole owner of Sweetwater and Vice President of Equatorial Guinea, Nguema
2 specifically negotiated for an agreement that the funds from sale of his Property would be used to
3 fund charities jointly selected by him and representatives of the United States to benefit the people
4 of his country.  This provides numerous intangible benefits to Nguema, including his interest in
5 accurate information being reported about the value of his property and proceeds he contributed to
6 the fun, the impact on his reputation, and personal satisfaction in improving the lives of the people
7 of his country, and Nguema would not have agreed to a settlement that did not provide funds for
8 this purpose or uses he would have no role in selecting.

9    Nguema and Sweetwater would not have agreed to allow profits to go to the broker hired
10 to get the best price, so he could throw parties, buy new cars, expensive travel or designer clothes,
11 or use it for his own benefit.  The ability to select, jointly with a United States designee, charities
12 to spend tens of millions of dollars to benefit the people of his country unquestionably provides
13 real benefits to Nguema individually and as Vice President of his country.

14    The very fact that Nguema and Sweetwater specifically negotiated for the right to choose
15 charities and for the use of the funds to benefit the people of his country itself is compelling proof
16 that it provided them, at a minimum, intangible benefits.  Nguema's continued efforts to get the
17 money to appropriate charities so it can be used, and pursuit of this action to recover proceeds that
18 should have been paid likewise confirms his interest.  As with deprivation of contract rights under
19 the Listing Agreement, Defendants' wrongdoing also unquestionably deprived Sweetwater of
20 negotiated benefits under the Settlement Agreement.

21    **4.  Plaintiff Would Have Standing To Sue Even If All Proceeds Recovered Must**
22    **Be Used For The Benefit Of Third Parties.**

23    Sweetwater also has standing to sue for the other damages it seeks, even if some or all may
24 ultimately be used to fund charities to benefit the people of Equatorial Guinea.  The motion argues
25 that the fact that Sweetwater agreed to use some of the money to benefit third parties to be chosen
26 with DOJ, it lost standing to sue.  Defendants cite no authority for this argument and fail to advise
27 the Court that a controlling decision of the United States Supreme Court has rejected it.

28    In a decision Defendants do not address, the Supreme Court specifically held the fact that a

1  plaintiff may be obligated to pay some or all of any recovery in the lawsuit to someone else does

2  not deprive it of standing to sue to recover for the proceeds.  *Sprint Comm'ns Co., L.P. v. APCC*

3  *Servs., Inc.,* 554 U.S. 269, 285-289 (2008) (assignee of contracting party's claim for money has

4  standing under Article III to pursue that claim in federal court, even if the assignee had agreed to

5  remit all proceeds recovered in the litigation to the assignor).

6        The Supreme Court held, in language that directly contradicts Defendants' argument:

7            That inquiry focuses, as it should, on whether the injury that a plaintiff

8        alleges is likely to be redressed through the litigation – ***not on what the***

9        ***plaintiff ultimately intends to do with the money he recovers***.  Here, a legal

10        victory would unquestionably redress the injuries for which the aggregators

11        bring suit.  The aggregators' injuries relate to the failure to receive the

12        required dial-around compensation.  And if the aggregators prevail in this

13        litigation, the long-distance carriers would write a check to the aggregators

14        for the amount of dial-around compensation owed.  ***What does it matter what***

15        ***the aggregators do with the money afterward***?  The injuries would be

16        redressed whether the aggregators remit the litigation proceeds to the

17        payphone operators, ***donate them to charity***, or use them to build new

18        corporate headquarters.

19  *Sprint Communications,* 554 U.S. at 286 (internal citations omitted, emphasis added).

20  Citing *Sprint,* courts have repeatedly upheld standing for plaintiffs who are obligated to pay all

21  proceeds of the litigation to a third party.  *See, e.g., Mitchell v. Blue Cross Blue Shield of North*

22  *Dakota,* 2018 WL 3463260 (D. N.D. July 18, 2018) (plaintiff had standing to sue for breach of a

23  contract, even though it had previously assigned the right to receive any proceeds recovered to a

24  third party); *Little v. Shell Exploration & Production Co.*, 690 F. 3d 282 (5th Cir. 2012); *Pacific*

25  *Sound Resources v. Burlington Northern and Santa Fe Ry. Co.*, 286 Fed. Appx. 381 (9th Cir. 2008)

26  (plaintiff has standing to sue for cleanup costs even if it is obligated to hand over any proceeds to a

27  third party); *A&T Siding, Inc. v. Capitol Specialty Ins. Corp.,* 2011 WL 3651777 (D. Ore. 2011)

28  (to the same effect); *North Cypress, supra,* 781 F.3d at 192.  Incredibly, Defendants cite neither

---

- 15 -

            OPP TO MOTION TO DISMISS
            2:19-CV-01848-GW-SS

1  *Sprint* nor any of the other many authorities that directly contradict their argument.

2  Sweetwater is the contracting party with the legal right to bring a claim.  In the Settlement

3  Agreement, the parties agreed on procedures by which the use of some of those proceeds will be

4  determined, including reimbursement of Sweetwater for repair and maintenance costs such as the

5  $1 million repair credit, and a process for choosing charities by Sweetwater and DOJ to receive

6  funds to use for the benefit of the Equatorial Guinea people.  No proceeds have yet been given to

7  any charity and the additional money Sweetwater seeks to recover will not be available for it to

8  use to fund a charity unless and until it is paid.  Indeed, no charity can be selected to receive the

9  funds recovered for Defendants' breaches unless and until they are recovered.

10  Sweetwater is bound by a procedure in the Settlement Agreement by which Nguema and

11  DOJ will decide on appropriate uses for additional proceeds.  As the authorities cited above hold,

12  the fact that use of some proceeds will be determined by the Settlement Agreement, including

13  appropriate charities, does not defeat its standing to sue to recover them.

14  **5.  <u>Sweetwater Has Standing To Sue For Losses To Any Third Parties Who May</u>**

15  **<u>Receive Proceeds Of The Sale Taken by Defendants.</u>**

16  Defendants fail to address the catch-all rule that, even where a plaintiff himself has not

17  suffered any cognizable tangible or intangible harm, it still has standing to sue for harm to others

18  where the plaintiff can demonstrate (1) a close relationship to the injured party and (2) a barrier to

19  the injured party's ability to assert its own interests.  *See Kowalski v. Tesmer,* 543 U.S. 125, 130

20  (2004).  Applying this exception, courts have permitted "[t]rustees [to] bring suits to benefit their

21  trusts; guardians ad litem [to] bring suits to benefit their wards; receivers [to] bring suit to benefit

22  their receiverships; assignees in bankruptcy [to] bring suit to benefit bankrupt estates; [and]

23  executors [to] bring suit to benefit testator estates."  *Sprint, supra,* 554 U.S. at 298; *see also Smith*

24  *v. Org. of Foster Families for Equality & Reform,* 431 U.S. 816, 841 n. 44 (1977).

25  Even if the only injured parties were the people of Equatorial Guinea who are designated

26  as ultimate beneficiaries of any proceeds that later may be allocated to charities or the panel under

27  the Settlement Agreement, Nguema has a close relationship with them as their Vice President and

28  as the owner of the Property who agreed to use of some of the proceeds of its sale for their benefit.

To the extent Nguema is obligated to use any or all of the proceeds for the benefit the people of his country, he holds them effectively in trust for their benefit, and has never disputed that the use of any money recovered will be determined by the Settlement Agreement or this Court.  He and his entity Sweetwater were specifically empowered to obtain those proceeds.

No charity has the ability to pursue this claim, both because they have not yet been selected and because Defendants would argue that they are obligated to use the proceeds for the benefit of third parties, not themselves.  The people of Equatorial Guinea who ultimately benefit also would face obstacles to pursuing a claim for several reasons, including the fact that it is not yet known which groups will benefit, they lack resources to bring a claim, they cannot establish the elements of the claims alleged here, and they would lack standing under the same principles Defendants cite, including concrete, non-speculative, and particularized injury.  Only Sweetwater can bring these claims, and has the legal right and standing to do so.

### B.  Sweetwater Has Not Waived Its Claims Against Defendants.

In a display of chutzpah that would be laughable if it was not included in a federal court filing, Defendants contend that the Settlement Agreement pursuant to which they were hired somehow prospectively protected them from any claim for violating that very agreement or the Listing Agreement they subsequently entered into with Sweetwater as required by the Settlement Agreement.  In Defendants' view of the world, they could have simply stolen all the proceeds or committed fraud or any other misconduct with impunity and face no consequence.  Who would ever hire a broker who believed he could do this?  It is not only inconceivable that Sweetwater, Nguema, the DOJ and this Court would have agreed that Sweetwater would enter into a Listing Agreement with Defendants and not have any right to enforce its terms, but, as shown below, nothing in the Settlement Agreement or Order supports such a claim.

*First,* the Settlement Agreement on its face does not extend any release to Defendants. Defendants cite a release and covenant not to sue by Sweetwater that extends only to any existing claims they may have against "the *United States*, and any and all officers, agents, representatives, attorneys, and employees of *same*, including all federal, state, and local enforcement officers." (Settlement Agreement at ¶ 42 (emphasis added)).

OPP TO MOTION TO DISMISS
2:19-CV-01848-GW-SS

1    Defendants are real estate brokers retained *by Sweetwater* to sell its Property.  Defendants

2    are not and never have been agents, employees or representatives of the United States, and the

3    Complaint certainly does not allege that they are.  Sweetwater is the only contracting party under

4    the Listing Agreement.  While Defendants agreed to comply with the Settlement Agreement and

5    to provide information to and obtain certain consents from the DOJ, nothing in the agreements or

6    otherwise even remotely suggests they were agents of the United States.

7    **Second,** California law requires that a written release purporting to exculpate a tortfeasor

8    from damage claims based on its future negligence or misconduct must clearly, unambiguously

9    and explicitly express this specific intent of the subscribing parties.  *See Allabach v. Santa Clara*

10   *County Fair Assn.* (1996) 46 Cal.App.4th 1007, 1015 (*declined to follow by City of  Santa*

11   *Barbara v. Sup. Ct.* (2007) 41 Cal. 4th 747).

12       If a tortfeasor is to be released from such liability the language used

13       "must be clear, explicit and comprehensible in each of its essential details. Such

14       an agreement, read as a whole, must clearly notify the prospective releasor or

15       indemnitor of the effect of signing the agreement."

16   *Id.* (q*uoting Paralift, Inc. v. Superior Court* (1993) 23 Cal.App.4th 748, 755).

17   Even if the release extended to Defendants, it does not mention future misconduct, and

18   certainly not by a broker hired to sell the Property *as required* by the Settlement Agreement, who

19   violates its very terms.  Defendants had not been selected or retained as of the date the Settlement

20   Agreement was executed.  It is inconceivable that Sweetwater and the United States would have

21   included specific requirements on a broker and then released it from any consequence for violating

22   those very requirements.  If Defendants were correct, then the United States and this Court would

23   have intended to release claims against them for violating the Settlement Agreement itself, which

24   undoubtedly would come as a surprise to the DOJ and this Court.  In fact, it would render the

25   entire agreement and its detailed and heavily negotiated terms meaningless.

26   **Third,** California Civil Code section 1542 provides as follows:  "A general release does

27   not extend to claims which the creditor does not know or suspect to exist in his or her favor at the

28   time of executing the release, which if known by him or her must have materially affected his or

OPP TO MOTION TO DISMISS
2:19-CV-01848-GW-SS

1  her settlement with the debtor."  The Settlement Agreement specifically acknowledges Section

2  1542 and includes a waiver of its limitations *only by the United States*.  But it includes no waiver

3  of Section 1542 by Sweetwater or Nguema.  Sweetwater could not have known or suspected that it

4  had these claims when it entered into the Settlement Agreement, as Defendants had not been

5  retained and had not yet committed their egregious wrongdoing.

6         *Fourth,* if the waiver, release and covenant not to sue extended to Defendants' future

7  fraud, breach of fiduciary duty, statutory violations and other intentional wrongdoing, it would be

8  void and unenforceable under California law and public policy.  *See* Cal. Civ. Code § 1668 ("All

9  contracts which have for their object, directly or indirectly, to exempt anyone from responsibility

10  for his own fraud, or willful injury to the person or property of another, or violation of law,

11  whether willful or negligent, are against the policy of the law.")

12         It is well-established in California that contract cannot be used to waive liability for future

13  fraud, breach of contract or fiduciary duty, or statutory violations.  *See Simmons v. Ratterree Land

14  Co.* (1932) 217 Cal. 201, 203-204, 17 P.2d 727 ("It is settled beyond doubt, manifestly on sound

15  grounds of justice, that a seller cannot escape liability for his own fraud or false representations by

16  the insertion of provisions such as are embodied in the contract of sale herein"); *Smith v. Rickards*

17  (1957) 149 Cal.App.2d 648, 654, 308 P.2d 758; *Blankenheim v. E.F. Hutton & Co.* (1990) 217

18  Cal.App.3d 1463, 1471-1472 ("[u]nder [section 1668], a party may not contract away liability for

19  fraudulent or intentional acts or for negligent violations of statutory law"); *Neubauer v. Goldfarb*

20  (2003) 108 Cal. App. 4th 47 (waiver of fiduciary duties is void).

21         The fact that Defendants were not signatories to the Settlement Agreement also does not

22  change this outcome.  The plain language of Section 1668 shows that its provisions apply to "[a]ll

23  contracts" the object of which is to directly or indirectly exempt "anyone" from responsibility for

24  his or her "own fraud" or violations of law.  *See Manderville v. PCG&S Group, Inc.* (2007) 146

25  Cal.App.4th 1486, 1500 (holding that provision in purchase agreement could not as a matter of

26  law insulate non-party broker from liability for fraud.)

27

28

1

### IV.    CONCLUSION

2     For the foregoing reasons, Defendants cannot avoid facing the consequences of their fraud,

3  breaches of statutes and contractual and fiduciary duties and other wrongdoing.  Instead of hiding

4  behind clearly inapplicable legal defenses, while taking "pot shots" for public consumption at

5  Sweetwater's detailed and well-documented accusations from behind the shield of a motion to

6  dismiss, Defendants should be required to admit or deny each of those detailed, well-pleaded

7  allegations, consistent with their obligations of candor and good faith under Rule 11.  Given that

8  most of the allegations come from Plaintiffs' own mouths and writings that they generated, their

9  reluctance to do so speaks volumes for the merits of the claims.

10

11  DATED:  May 13, 2019

12

13                              By:  _Kevin Fisher_____

14                                   Kevin Fisher
                                     Attorneys for Plaintiff
15                                   SWEETWATER MALIBU CA, LLC

16

17

18

19

20

21

22

23

24

25

26

27

28

---

OPP TO MOTION TO DISMISS
                                         2:19-CV-01848-GW-SS