Kevin Fisher (State Bar No. 131455)
Praxis Law
P.O. Box 26249
Los Angeles, CA 90026
Telephone: (310) 862-1225
Facsimile: (310) 388-0805
rkf@fkslaw.net

Julian Brew (State Bar No. 150615)
Cypress, LLP
11111 Santa Monica Boulevard, Suite 500
Los Angeles, CA 90025
Telephone: (424) 317-6220
Facsimile: (424) 750-5100
julian@cypressllp.com

Attorneys for Plaintiffs
SWEETWATER MALIBU CA LLC
and TEODORO NGUEMA OBIANG MANGUE

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SWEETWATER MALIBU CA, LLC, a California limited liability company; and TEODORO NGUEMA OBIANG MANGUE, an individual,<br><br>            Plaintiff,<br><br>     vs.<br><br>MAURICIO UMANSKY, and individual; and UMRO REALTY CORP., a California corporation, dba THE AGENCY,<br><br>            Defendants. | Case No. CV 19-1848-GW-SSx<br><br>**SECOND AMENDED COMPLAINT FOR:**<br>**(1) BREACH OF SETTLEMENT AGREEMENT & ORDER;**<br>**(2) BREACH OF FIDUCIARY DUTIES;**<br>**(3) STATUTORY VIOLATIONS;**<br>**(4) BREACH OF LISTING AGREEMENT;**<br>**(5) INTENTIONAL FRAUD;**<br>**(6) NEGLIGENT MISREPRESENTATION AND (7) NEGLIGENCE & NEGLIGENCE PER SE** |

**SECOND AMENDED COMPLAINT**

Plaintiffs Sweetwater Malibu CA, LLC, formerly known as Sweetwater Malibu, LLC ("Sweetwater"), and Teodoro Nguema Obiang Mangue ("Nguema") (collectively, "Plaintiffs"), for their Second Amended Complaint against defendants Mauricio Umansky ("Umansky") and UMRO Realty Corp. also doing business as The Agency (the "Agency") (collectively, "Defendants"), allege as follows.

## JURISDICTION

1. This action relates to and includes claims against Defendants for breach of a Stipulation and Settlement Agreement (the "Settlement Agreement") entered into in connection with a civil asset forfeiture action in the United States District Court for the Central District of California, entitled <u>United States of America v. One Michael Jackson Signed Thriller Jacket, et al</u>. (Case No. CV 13-9169-GW-SS) (the "Action"). The Settlement Agreement expressly bound and imposed obligations on Defendants. Defendants also expressly agreed to comply with the Settlement Agreement and be bound by its terms.

2. The Settlement Agreement provides that the "the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Settlement Agreement is the United States District Court for the Central District of California," and that such court "shall retain jurisdiction to enforce this Settlement Agreement."

3. The Settlement Agreement was filed in the Action, and the Court entered an Order on October 13, 2014 (the "Order"), ordering each party to "cooperate with the other(s) to perform the acts required by the Settlement Agreement, and [to] refrain from taking any action that is inconsistent with the Settlement Agreement." The Order stayed the Action and stated that the "Court retains jurisdiction in this matter to take additional action and enter further orders as necessary to implement and enforce this Order and the Settlement Agreement."

4. Accordingly, this Court has ancillary jurisdiction over the claims in this action, because they include claims for breaches of the Settlement Agreement which also constituted violations of the Order issued by the United States District Court for the Central District of California. *See Kokkonen v. Guardian Life Ins. Co.,* 114 S. Ct. 1673 (1994).

**INTRODUCTION**

5.  This case involves brazen breaches of fiduciary duties by a high-end real estate broker and his firm the Agency, who were hired by Plaintiffs to sell a multi-million-dollar Malibu estate. As Plaintiffs' brokers and agents, Defendants owed statutory, common law and contractual duties, including fiduciary duties of the utmost care, loyalty and honesty. The duties owed by Defendants included the duty to disclose all facts relevant to Plaintiffs' decisions in connection with the sale of the property, the duty to disclose all offers for the property, and the duty not to engage in self-dealing or earn secret profits from the representation.

6.  While every real estate broker or agent owes these duties to its clients, Defendants held themselves out as a premier brokerage firm, with unique skills and connections that would enable them to be trusted to obtain the best possible prices for their clients in the sale of ultra-high priced and extremely valuable properties, and charged clients a premium commission for their services. Plaintiffs relied on this purported expertise in retaining Defendants at a commission above the normal market rate for real estate brokers in California.

7.  Defendants violated virtually every one of these duties, by engaging in blatant acts of self-dealing, earning secret profits, and both failing to disclose and outright misrepresenting material facts. Among other things, they advised Plaintiffs to accept an offer from another client Mauricio Oberfeld, without disclosing that (i) they knew that a far higher price could have been obtained and had been offered a significantly higher price by at least one other prospective buyer, (ii) Oberfeld would need to obtain financing or investors in order to close the purchase, despite purporting to offer an "all cash" deal without the need for financing, (iii) Defendants were secretly working for Oberfeld to find him buyers and investors to complete the purchase, and (iv) Defendants had been offered secret compensation from buyers they recommended, and favored offers from their other existing clients over better offers.

8.  After persuading Plaintiffs to accept Oberfeld's offer, Defendants failed to disclose additional material facts, including their receipt of offers millions of dollars higher than Oberfeld's that they instead delivered to Oberfeld and that provided Defendants with additional secret profits, and that Defendants were actively searching for and finding buyers of the property from Oberfeld

for millions of dollars more.  Without disclosing these facts, Defendants pressured Plaintiffs to waive a required $1 million deposit from Oberfeld, allowing him to tie up this valuable property for no consideration.  Defendants also pressured Plaintiffs to repeatedly extend the escrow as they looked for investors and buyers for Oberfeld, and to agree to a repair credit of $1 million, while insisting that the market was softening and no other buyer could be found.

9. As a result of Defendants' flagrant breaches of their fiduciary, statutory and contractual duties, Oberfeld was able to purchase the property for less than $33 million, well below its potential price, and to sell it less than a year later for almost $70 million, resulting in massive profits that Oberfeld shared with Defendants.

## THE PARTIES

10. Plaintiff Sweetwater Malibu CA, LLC, formerly known as Sweetwater Malibu, LLC, is and at all relevant times was a California limited liability company and the owner of a multi-million-dollar estate located at 3620 Sweetwater Mesa Road in Malibu, California (the "Property").  At all relevant times, Sweetwater's sole owner and managing member was Nguema, now Vice President of Equatorial Guinea ("EG").  Pursuant to an agreement between Plaintiffs and the United States Department of Justice, Plaintiffs agreed to sell the Property, and use the proceeds for specified purposes, including to benefit the people of EG.

11. Mauricio Umansky is and at all relevant times was a resident of the State of California, Los Angeles County.  He is and at all relevant times a real estate broker licensed by the California Department of Real Estate.

12. Defendant UMRO Realty Corp., is a California corporation, with its principal place of business in Los Angeles County, California, which does business as The Agency.  Umansky is and at all relevant times was its founder and CEO.

13. On information and belief, each defendant was the agent, employee, principal, or co-conspirator of each other defendant and other third parties as alleged herein, or aided and abetted their wrongdoing, acting within the course and scope of such agency or employment, or in furtherance of such conspiracy, such that each is jointly and severally liable for all damages and secret profits alleged herein.

**FACTS COMMON TO ALL CAUSES OF ACTION**

14. On December 12, 2013, the United States filed the Action, seeking among other things civil forfeiture of the Property. On or about October 9, 2014, the parties entered into the Settlement Agreement, resolving those claims by, among other things, providing for Plaintiffs to sell the Property using a licensed real estate broker, with the proceeds of the sale to be used as specified, including to benefit the people of EG. The Settlement Agreement was filed in the Action, and the Court entered an Order on October 13, 2014 (the "Order"), ordering each party to "cooperate with the other(s) to perform the acts required by the Settlement Agreement, and [to] refrain from taking any action that is inconsistent with the Settlement Agreement."

15. The Settlement Agreement provided that the parties shall jointly select a licensed real estate agent to list and sell the Property, and that the contract with the agent "will require that the Licensed Agent review and comply with the provisions of this Settlement Agreement."

16. The Settlement Agreement provided that the listing agent was obligated "to work cooperatively with the United States in the conduct of its activities, including reporting regularly to the United States and providing all requested information promptly to the United States relating to the [property] and its sale." The Settlement Agreement provided that the property "will be sold in accordance with the terms of this Settlement Agreement for fair-market-value ("FMV"), as that term is defined pursuant to California Code of Civil Procedure Section 1263.320, unless a sale at an alternative price is approved in writing by both counsel for the United States and counsel for Nguema, in arm's length transactions. . ."

17. Section 1263.320 defines fair market value as: "The fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available."

18. Defendants are very high-end licensed real estate brokers who hold themselves out as the "preeminent player in the luxury real estate market, representing many of the country's most

visible and high-end properties." Defendants tout to the public and prospective clients their "knowledge, spheres of influence, contacts and expertise, ensuring our clients better representation and a true competitive edge." Umansky personally promotes himself "as the #3 top-producing real estate agent in the U.S. and #1 in California," having sold the most homes in the country above $20 million, and his representation of celebrities and very wealthy individuals. He also is married to one of the "Beverly Hills Housewives," and has frequent appearances on the show, adding to his carefully cultivated persona and reputation.

19. In 2015, pursuant to the Settlement Agreement and Order, Defendants entered into an exclusive listing agreement (the "Listing Agreement") with Plaintiffs, which provided for a commission of six percent (6%) of the sale price, higher than the typical amount of five precent (5%) or less. Plaintiffs agreed based on Umansky's reputation, and the belief he could be trusted to get the best possible price. The Listing Agreement obligated Defendants to comply with the Settlement Agreement, and provided that the "Settlement Agreement provisions will prevail in the event any of them conflict with the terms in this Agreement."  While Defendants had to agree that any sale would comply with the Settlement Agreement, their only clients were Plaintiffs, who owned the property and had the sole discretion to agree to any sale over $32 million.

20. In August 2015, after entering into the Listing Agreement, Umansky presented Plaintiffs with a written list of offers from potential buyers, most of whom were also their clients, entitling them to the full commission of six percent (6%). All of those offers were supposedly in the range of $32 to $33.5 million. In fact, Umansky had received other significantly higher offers. For example, before the offer from Oberfeld was accepted, a buyer named Sam Hakim had verbally offered $40-45 million for the Property, but Umansky told him not to put it in writing as he was trying to keep the price as low as possible to benefit the buyer.

21. At Umansky's recommendation, Sweetwater countered to all at $33.5 million instead of higher. Of those who accepted, Defendants pressed Plaintiffs to proceed with one of his clients, Oberfeld, instead of Sam Hakim, who he did not disclose had offered $40-45 million and other non-clients who also agreed to the $33.5 million counter-offer and likely would have paid more. Plaintiffs followed this advice and accepted Oberfeld's offer.

22. Plaintiffs have since learned that, despite making an "as is" cash offer, Oberfeld in fact did not have the funds to close the purchase, and was seeking both a loan and investors to help pay the purchase price, or to find another buyer to whom to flip the property. Defendants were well aware of this information before presenting the offer that specifically stated there would be no third-party financing but did not disclose it to Sweetwater. Indeed, Defendants were already actively helping Oberfeld find buyers and investors.

23. Defendants also failed to disclose to Plaintiffs that the agent for Hakim, whose offer was accepted as a backup at their recommendation, had agreed in writing to "kick back" to Defendants one third of his share of the commission as secret profits. Neither the offer nor signed addendum to the offer confirming the kickback were disclosed to Plaintiffs. Umansky wrote in response: "Received. You are a man of your word. I truly hope that you get picked."

24. Even more troubling, Umansky was helping Oberfeld find investors and buyers, and received offers to pay millions more for the Property than Oberfeld. Umansky did not deliver these offers to Plaintiffs, his clients and Property owners, but presented them to Oberfeld, who did not yet own the Property, and had not paid the required deposit or satisfied contingencies.

25. On December 23, 2015, Umansky emailed Oberfeld to tell him his offer had been picked. Oberfeld responded: "Fantastic. Moe, how did it go w your guy." Umansky quickly responded: "Very well. He might take it off our hands. I pitched it for 42." He identified this prospective buyer as Ian Livingstone. In other words, by the time Umansky had persuaded Sweetwater to accept Oberfeld's offer at $33.5 million, he was already secretly discussing sale of to a third party for almost $10 million more.

26. In February 2016, Umansky received a written offer from Hakim for $8 million over the offer from Oberfeld, with 4% payable to Umansky as a commission. Umansky presented the offer to Oberfeld, but not Plaintiffs who owned the property. Also undisclosed to Plaintiffs, Umansky sent Hakim a counter-offer of $15 million on behalf of Oberfeld, with the same 4% commission to Defendants on the resale or "flip."

27. Not only did Defendants fail to disclose these other higher offers or that Oberfeld needed to find investors to close, but they also urged Plaintiffs to waive the required $1 million

- 6 -
**SECOND AMENDED COMPLAINT**

deposit, claiming "the Buyer is concerned about having 1 Million dollars tied up indefinitely" and it would not be possible to find another buyer for the property when they knew that it was because Oberfeld had not yet raised enough money. Plaintiffs agreed in reliance on this advice. Thus, with Defendants' help, Oberfeld tied up a $33.5 million property without a penny at risk, while the seller's broker and fiduciary secretly helped him looked for a buyer of his own.

28. With the deadlines for various contingencies and close rapidly approaching, Umansky repeatedly urged Sweetwater to extend the contingency period and close of escrow, in contrast to his advice to accept Oberfeld's offer because of the supposed urgency in closing before March. While he and Oberfeld secretly worked to flip the property, Umansky persuaded Plaintiffs to agree to extend the contingency period and close without disclosing these efforts.

29. In April, Umansky was still helping Oberfeld find investors or buyers so he could complete the purchase. Despite having agreed to buy the property "as is," Oberfeld requested a $1 million credit for repairs. Instead of telling Sweetwater it could deny the request and that other buyers had offered to buy the property for more money, Umansky pushed Plaintiffs "so hard" to agree to the credit. Ultimately, Plaintiffs reluctantly agreed, benefiting the buyer and anyone else who would receive an interest in the flip, including Umansky. The United States has taken the position that Plaintiffs are themselves liable for this $1 million.

30. Just two weeks before the close, with contingencies cleared and the deed signed by Plaintiffs, Umansky wrote the Department of Justice that Oberfeld had just "invited me to invest with him" and "to express my intention of making an investment with Mauricio Oberfeld into the deal." Three days later, Umansky wrote an e-mail to Sweetwater about several topics. Towards the end of the e-mail Umansky wrote, "for the sake of full disclosure . . . Mauricio [Oberfeld] invited me to invest about one month ago after we removed all contingencies [and] I do intend to make an investment with them." This "full disclosure" was anything but. This "disclosure" was not made until it was too late for Sweetwater to get out of the sale to Oberfeld. It also itself was another fraud, as conspicuously absent was any disclosure of Umansky's other dealings, financial interests, and conflicts outlined above, including long before contingencies were removed.

31. In mid-2017, less than a year after the close of the sale to Oberfeld and his "partners," including Umansky, they resold the property for $69.9 million, more than double what they paid. An earlier article stated that: "Oberfeld bought the neglected property, on Sweetwater Mesa Road, in partnership with Mauricio Umansky, co-founder of luxe brokerage the Agency, last year, records show." It cited sources stating "the partners are likely to make a hefty profit, since they acquired the property for a massive discount." The Agency website also referred to Oberfeld as one of its "partners," and featured him posing with Umansky.

32. After learning this information, Sweetwater's counsel wrote Umansky and The Agency to demand additional information about his involvement in the transactions. On April 6, 2018, Defendants entered into a written tolling agreement that, as amended, extending any statute of limitations of other defense based on the passage of time for an additional nine months.

**FIRST CAUSE OF ACTION**

**(Breach of Settlement Agreement and Order)**

33. Plaintiff hereby incorporates in this cause of action paragraphs 1 through 32 inclusive above as though fully set forth herein.

34. As set forth above, the Settlement Agreement and Order imposed obligations on Defendants as listing agents for the Property, including the obligations to sell the Property for fair market value, and to work cooperatively with the United States and provide it with relevant information related to the Property and sale. The Settlement Agreement also included an implied covenant of good faith and fair dealing in Defendants' performance. In the Listing Agreement, Defendants specifically agreed to comply with the Settlement Agreement and agreed that its terms would prevail in the event of a conflict between the two agreements.

35. Defendants knew at the time of the sale of the Property to Oberfeld that it was not being sold for fair market value and could be sold for millions of dollars more than the sale price. By knowingly advising Sweetwater to agree to and close the sale to Oberfeld for far less than its fair market value, knowing that higher offers had been made or could be achieved, Defendants breached the Settlement Agreement and violated the Order.

36.     Defendants also breached the Settlement Agreement and violated the Order by failing to work cooperatively with the United States and provide truthful and accurate information, by providing materially false information related to the sale, and knowingly misleading the United States and Plaintiffs as to offers and other facts material to decisions with respect to the sale.  If Defendants had provided accurate information as alleged herein, the United States would have advised Plaintiffs and both Plaintiffs and the United States would had accurate information to make decisions concerning the Property.  Defendants and their co-conspirators thereby also wrongfully took for themselves millions of dollars that should have been included as proceeds of the sale and used as provided in the Settlement Agreement and Order.

37.     Defendants' breaches also deprived Plaintiffs of important and valuable contractual rights and benefits under the Settlement Agreement and Order, including the ability to use all of the proceeds of the sale at fair market value as provided in the Settlement Agreement.

38.     As legal and proximate result, Plaintiffs were damaged in an amount to be proven at trial, and deprived of material consideration, rights and benefits under the Listing Agreement, Settlement Agreement and Order as alleged herein.  Plaintiffs also are entitled to disgorgement of all secret profits obtained by Defendants and their co-conspirators as a result of their breaches and wrongdoing alleged herein.

## SECOND CAUSE OF ACTION

**(Breach of Fiduciary Duties)**

39.     Plaintiff hereby incorporates in this cause of action paragraphs 1 through 38 inclusive above as though fully set forth herein.

40.     As real estate brokers, Defendants owed Plaintiffs fiduciary duties, including duties of the utmost care, integrity, honesty, and loyalty, and the duties to notify the client of all offers and to give the client all information in the broker's possession that may be material to the client's decisions in connection with the sale.

41.     While California allows a broker to represent both the buyer and seller in the same transaction, with full disclosure of the arrangement and informed consent, it continues to owe fiduciary duties to both clients, limited only by the proviso that it may not disclose to either client

that the other is willing to pay (or accept) a higher (or lower) price for the property. Among other things, a dual agent must still disclose to the seller the duty to disclose all material facts other than any higher price the buyer is willing to pay, and a fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the seller or the buyer.

42. Among the duties owed by real estate brokers is a duty not to receive any secret profits arising from the representation without full disclosure of details of the arrangement and informed consent of the client. This duty is codified by statute, and violation of this duty also is grounds for disciplinary action including loss of the broker's license. Cal. Bus. & Prof. Code § 10176(g). A broker or agent who receives secret profits also must disgorge them to his client, whether or not the client would have received a better price absent them.

43. Defendants' duties to Plaintiffs did not end with the signing of a purchase agreement, but continued until at least the close, especially because Defendants successfully pressured Plaintiffs to (ii) waive the requirement that Oberfeld pay a deposit of $1 million, (ii) extend deadlines for physical inspection contingencies and close of escrow instead of exercising its right to terminate the sale to Oberfeld due to his breaches and failure to satisfy conditions, and (iii) agree to a $1 million credit for repairs.

44. Defendants breached their fiduciary duties to Plaintiffs and conspired with each other and with third parties to breach their fiduciary duties, as alleged above, including without limitation the misrepresentations, non-disclosures, secret profits, and other breaches of loyalty, care and honesty alleged herein.

45. If Defendants had not breached their fiduciary duties, Plaintiffs would not have entered into the purchase agreement with Oberfeld or would have terminated the purchase due to Oberfeld's failure to pay the required deposit, failure to close by the required date, or failure to waive the physical inspection contingency, and would have sold the property to another buyer for millions of dollars more. Alternatively, if Oberfeld had timely cured those breaches, Sweetwater would not have agreed to the demand for a $1 million repaid credit.

46. As a proximate and legal result, Plaintiffs have been damaged in an amount to be proven at trial, and deprived of material consideration, rights and benefits under the Listing

Agreement, Settlement Agreement and Order as alleged herein.  Plaintiffs also are entitled to disgorgement of all secret profits obtained by Defendants and their co-conspirators as a result of their breaches and wrongdoing alleged herein, and a constructive trust over such profits.

47.     Defendants acted with fraud malice and oppression, entitling Sweetwater to recover punitive or exemplary damage in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### (Violations of Statutes Governing Licensed Brokers)

48.     Plaintiff hereby incorporates in this cause of action paragraphs 1 through 47 inclusive above as though fully set forth herein.

49.     California Business & Professions Code section 10176 prohibits and provides for disciplinary proceedings against any licensed real estate broker who engages in any of several specified violations, including making of any "substantial misrepresentation" and "claiming or taking by a licensee of any secret or undisclosed amount of compensation, commission, or profit or the failure of a licensee to reveal to the employer of the licensee the full amount of the licensee's compensation, commission, or profit[.]"

50.     California Civil Code section 2079.16 provides that, in order to represent both buyer and seller in a real estate transaction, a licensed broker must fully disclose all arrangements to both parties and obtain their informed consent, and owes a fiduciary duty of the utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer, including a duty to disclose to the seller material facts affecting the transaction.

51.     As set forth above, Defendants made numerous substantial misrepresentations to Sweetwater in the course of the sale of the Property, failed to disclose agreements with Oberfeld and others providing for secret profits and commissions in addition to commissions paid by Sweetwater under the listing agreement, as well as other material facts, and breached duties of care, integrity, honesty and loyalty to Plaintiffs.

52.     If Defendants had disclosed these offers and facts, Plaintiffs would not have entered into the purchase agreement with Oberfeld or would have terminated the purchase due to his failure to pay the agreed deposit, failure to close by the agreed date, or failure to timely satisfy

the inspection contingency, and would have sold the Property to another buyer for millions of dollars more than Oberfeld.  Alternatively, if Oberfeld timely cured those breaches, Sweetwater would not have agreed to the demand for a $1 million repaid credit.

53. As a proximate and legal result, Plaintiffs have been damaged in an amount to be proven at trial, and deprived of material consideration, rights and benefits under the Listing Agreement, Settlement Agreement and Order as alleged herein.  Plaintiffs also are entitled to disgorgement of all secret profits obtained by Defendants and their co-conspirators as a result of their breaches and wrongdoing alleged herein.

## FOURTH CAUSE OF ACTION

### (Breach of Listing Agreement)

54. Plaintiff hereby incorporates in this cause of action paragraphs 1 through 53 inclusive above as though fully set forth herein.

55. The Listing Agreement between Defendants and Plaintiffs imposed on Defendants, among other things, (i) a duty to present to Plaintiffs any and all offers for the property, (ii) a duty to use reasonable care and due diligence in carrying out the agreement, (iii) a duty to disclose all facts affecting the value or desirability of the property, (iv) fiduciary duties of the utmost care, honesty, integrity and loyalty, and (v) a duty to disclose any and all financial and other arrangements with the buyer in the case of a dual agency.

56. As alleged in greater detail above, Defendants breached the Listing Agreement by, among other things, their (i) failure to disclose to Plaintiffs multiple offers for the Property that exceeded the price offered by Oberfeld, (ii) failure to exercise reasonable care and due diligence, (iii) failure to disclose numerous material facts affecting the value and desirability of the Property. (iii) failure to act with the utmost care, loyalty, integrity and honesty, and (iv) failure to disclose all facts concerning their financial and other arrangements with the buyers.

57. As a proximate and legal result, Plaintiffs have been damaged in an amount to be proven at trial, and deprived of material consideration, rights and benefits under the Listing Agreement, Settlement Agreement and Order as alleged herein.  Plaintiffs also are entitled to

disgorgement of all secret profits obtained by Defendants and their co-conspirators as a result of their breaches and wrongdoing alleged herein.

### FIFTH CAUSE OF ACTION

### (Intentional Fraud)

58. Plaintiff hereby incorporates in this cause of action paragraphs 1 through 57 inclusive above as though fully set forth herein.

59. As alleged in greater detail below, Defendants knowingly misrepresented to Plaintiffs material facts, including (i) that the offer from Oberfeld was "all cash" not contingent on any third party financing, (ii) that Defendants were using their best efforts and due diligence to sell the property for Plaintiffs and would disclose to them all offers Defendants might receive for the Property, (iii) that Oberfeld was ready, willing and able to close the sale within 60 days, (iv) that Sweetwater would be unable to find another buyer at the same or greater price if it did not waive the agreed deposit, extend escrow, and agree to a $1 million credit for repairs, (v) that Defendants were first offered the opportunity to "invest" in the Property only after all contingencies were satisfied, and (vi) that Oberfeld's offer was the highest.

60. As alleged in greater detail below, Defendants also failed to disclose material facts they had duty to disclose, including the (i) the existence of offers for the property significantly higher than the offer from Oberfeld that they advised Plaintiffs to accept, (ii) that Oberfeld was unable or unwilling to close the purchase if he was unable to not find investors and other third party financing, (iii) that Defendants had been offered additional consideration by Oberfeld and other offerors, and (iv) the nature and existence of arrangements that would give them secret profits or consideration beyond their disclosed commissions.

61. For example, in the Listing Agreement Umansky signed with Plaintiffs on or about June 16, 2015, he represented that he would use "reasonable effort and due diligence" to sell the Property and disclose all offers.  In order to induce Plaintiffs and DOJ to approve him as Listing Agent, Umansky emailed marketing materials highlighting his "notable sales" to Stephen Gibbons of DOJ on March 24, 2015, and touted his skill and results to Plaintiffs in meetings with Plaintiffs' representatives, including Nguema and Matias Mba Medja in early June in Geneva, Switzerland.

Before the Listing Agreement could take effect, it also had to be approved by DOJ and was further modified at DOJ's request. To induce DOJ to approve him, Umansky further described his skills and qualifications in a telephone call with Gibbons on or about May 22, 2015.

62. On August 16, 2015, Umansky provided Plaintiffs with a written list of all offers he claimed to have received for the Property, but omitted higher offers, including one for $40 million from Sam Hakim. The list falsely represented that the offer from Oberfeld was "all cash" and he could close within 45 days, and that Hakim had offered only $32 million rather than $40 million. Umansky also represented that the offer from Hakim was $32 million in an email to Matias on July 31, 2015. On November 2, 2015, Umansky sent an email to Nguema falsely stating we "have been very diligent in trying to get the deal done with Candy [another buyer]" when the truth was he was not working to get a deal done with Candy, but to with Oberfeld. The written offer from Oberfeld that was signed and presented to Nguema and his agents by Umansky in August 2015, stated that his offer was "all cash" and no third party funding was needed, and that Oberfeld would be able to close within 45 days. Umansky knew these statements were false but did not disclose those facts to Plaintiffs when he presented the offer or at any time between that date and when Plaintiffs accepted Oberfeld's offer as amended.

63. Despite having received other offers as high as $45 million that he did not disclose, Umansky recommended by email to Nguema on October 1, 2015 that Plaintiffs counter to all of the offers at the same $33.5 million price. Umansky did so to keep the price as low as possible for himself and his partner Oberfeld. At Umansky's recommendation, and in reliance on the above representations and non-disclosures, Plaintiffs agreed to sell the Property to Oberfeld in December 2015, pursuant to the offers and counter-offers for $33.5 million.

64. On March 20, 2016, Umansky verbally advised Plaintiffs' agent Michael Berger that he recommended agreeing to waive a $1 million the deposit Oberfeld did not want his money tied up indefinitely, without disclosing that he did not have funds available and the other better offers he received. Umansky also recommended that Plaintiffs agree to extend the contingency period because he believed Oberfeld was the "right buyer" for the Property, without disclosing better offers and that Hakim had provided written proof of available funds to close at a much

higher price.  On March 20, 2016, Berger sent an email to Nguema describing this conversation and Umansky's recommendation that Plaintiffs waive the deposit and sign an extension of the escrow period, which Plaintiffs accepted.  On March 20, 2016, eager to get the amendment signed, Umansky emailed Berger to urge him to get the paperwork signed because "the economy is changing and the market is softening so again I repeat time is of the essence."   If Plaintiffs had not agreed, then the contingency period would have expired the following day, and Plaintiffs could have sold the Property to Hakim or another buyer for millions of dollars more.

65. On April 15, 2016, Umansky sent an email to Nguema and Berger stating that Oberfeld had requested a $1 million credit for repairs, and "my suggestion is to move forward with the credit to the buyer and get this transaction closed before summer season kicks off here." On April 23, 2016, Umansky sent an email to Stephen Gibbons of the DOJ about the repaid credit and stating that he was "pushing Nguema so hard" and the "property is getting vandalized." On May 5, 2016, Umansky sent an email to Berger and another agent of Plaintiffs forwarding an e-mail of the same date from Oberfeld asking about the status of the repair credit request.  The e-mail from Umansky stated: "October is getting close.  Let's please close this deal."  At no time did Umansky advise Plaintiffs that, if they did not agree to the repair credit, Oberfeld would not close the sale and they could sell it for a significantly higher price.

66. On June 13, 2016, Umansky sent an email to Gibbons of DOJ stating: "I wanted to express my intention of making an investment into the deal."  Umansky also wrote that this would clarify "any potential conflict of interest," and was "just for full disclosure."  On June 16, 2016, Umansky sent an email to Berger addressing several topics and then stating at the end "for the sake of full disclosure": "[Oberfeld] invited me to invest about one month ago after we removed all contingencies.  I do intend to make an investment with him."  These statements were false and misleading, because Oberfeld in fact had invited Umansky to invest much earlier, and they did not disclose all conflicts of interest, because the omitted the other conflicts described above, including the fact that Oberfeld was simultaneously looking for a buyer for Oberfeld at significantly higher prices, while he was supposed to be working to get the highest price for Plaintiffs.  The June 13

email to Gibbons also falsely stated that "Nguema picked the order of which I was to accept the offers," when in fact Umansky had selected the order and chose Oberfeld.

67. As alleged above, Defendants knew the falsity of these misrepresentations and non-disclosures and made them with the intent to induce Plaintiffs to proceed with and close the sale of the Property to Oberfeld at the price he offered with a $1 million repair credit.

68. Plaintiffs were unaware of the falsity of these representations or of the facts that were not disclosed and relied on such representations and non-disclosures in accepting the offer from Oberfeld and closing the sale to him.

69. As a proximate and legal result, Plaintiffs have been damaged in an amount to be proven at trial, and deprived of material consideration, rights and benefits under the Listing Agreement, Settlement Agreement and Order as alleged herein. Plaintiffs also are entitled to disgorgement of all secret profits obtained by Defendants and their co-conspirators as a result of their breaches and wrongdoing alleged herein, and a constructive trust over such profits.

70. Defendants acted with fraud malice and oppression, entitling Sweetwater to recover punitive or exemplary damage in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

**(Negligent Misrepresentation)**

71. Plaintiff hereby incorporates in this cause of action paragraphs 1 through 70 inclusive above as though fully set forth herein.

72. As alleged in greater detail above, Defendants misrepresented material facts and failed to disclose material facts they had duty to disclose, that were material to the sale.

73. In the alternative, Defendants made the foregoing misrepresentations and non-disclosures without a reasonable basis, and with the intent to induce Defendants to proceed with and close the sale of the Property to Oberfeld

74. Sweetwater was unaware of the falsity of these representations or of the facts that were not disclosed and relied on such representations and non-disclosures in accepting the offer from Oberfeld and closing the sale to him.

75.     As a proximate and legal result, Plaintiffs have been damaged in an amount to be proven at trial, and deprived of material consideration, rights and benefits under the Listing Agreement, Settlement Agreement and Order as alleged herein.  Plaintiffs also are entitled to disgorgement of all secret profits obtained by Defendants and their co-conspirators as a result of their breaches and wrongdoing alleged herein, and a constructive trust over such profits.

## SEVENTH CAUSE OF ACTION

### (Negligence and Negligence Per Se)

76.     Plaintiff hereby incorporates in this cause of action paragraphs 1 through 75 inclusive above as though fully set forth herein.

77.     As professional licensed real estate brokers, Defendants had the duty to exercise reasonable care commensurate with their professional licensure, skill and training, in carrying out their duties as Sweetwater's broker in selling the property.  Defendants also held themselves out as having greater experience and skill than other brokers, who could be entrusted with the sale of extremely valuable properties, and charging above-market commissions for their services, thereby imposing on themselves an even higher standard of care.

78.     Defendants also were subject to various laws regulating the activities of licensed real estate brokers, that were intended to protect sellers of property who use the services of real estate brokers, including (i) California Business & Professions Code section 10176 prohibiting making of any "substantial misrepresentation" and "claiming or taking by a licensee of any secret or undisclosed amount of compensation, commission, or profit or the failure of a licensee to reveal to the employer of the licensee the full amount of the licensee's compensation, commission, or profit," and California Civil Code section 2079.16 providing that, in order to represent both buyer and seller in a real estate transaction, a licensed broker must fully disclose all arrangements to both parties and obtain their informed consent, and owes a fiduciary duty of the utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer, including a duty to disclose to the seller material facts affecting the transaction.

79.     As set forth above, Defendants failed to exercise due care and breached these statutory duties by, among other things, (i) negligently seeking, negotiating and recommending

offers for the property, which could have been sold for significantly more had they exercised the appropriate standard of care, (ii) failing to advise Plaintiff of the opportunity to sell the property at higher prices, (iii) advising Plaintiff not to terminate the sale to Oberfeld due to his breaches and instead advising Plaintiff to waive those breaches, and (iv) advising Plaintiff to agree to a $1.3 million repaid credit instead of terminating for failure to waive the inspection contingency.

80. As a proximate and legal result, Plaintiffs have been damaged in an amount to be proven at trial, and deprived of material consideration, rights and benefits under the Listing Agreement, Settlement Agreement and Order as alleged herein. Plaintiffs also are entitled to disgorgement of all secret profits obtained by Defendants and their co-conspirators as a result of their breaches and wrongdoing alleged herein, and a constructive trust over such profits.

**PRAYER FOR RELIEF**

Plaintiffs Sweetwater Malibu CA, LLC and Teodoro Nguema Obiang Mangue pray for the following relief:

1. For damages in an amount to be proven at trial;
2. For disgorgement of profits and a constructive trust over such profits;
3. For prejudgment interest according to proof;
4. For punitive or exemplary damages according to proof;
5. For costs of suit; and
6. For such other relief as is deemed appropriate at trial.

**DEMAND FOR JURY TRIAL**

Plaintiffs Sweetwater Malibu CA, LLC and Teodoro Nguema Mangue hereby request a jury trial on all issues raised in the complaint.

DATED: September 23, 2019

By: *Kevin Fisher*
Kevin Fisher
Attorneys for Plaintiffs
SWEETWATER MALIBU CA, LLC and
TEODORO NGUEMA OBIANG MANGUE

- 18 -
**SECOND AMENDED COMPLAINT**